In re BAKER & GETTY FINANCIAL SERVICES, INC., Baker & Getty Diversified, Inc., Baker & Getty Securities, Inc., Philip Cordek, and Suzan Bierman Cordek, Debtors.

Carl D. RAFOTH, Trustee, Plaintiff,

v.

Dr. Frank BAILEY, et al., Defendants.

Bankruptcy No. B87–00074–Y.
Adv. No. 87–0043.

United States Bankruptcy Court,
N.D. Ohio.

May 24, 1988.

Carl D. Rafoth, Ohio, trustee/plaintiff.

Russell A. Kelm, Daniel R. Swetnam, Columbus, Ohio, for plaintiff/trustee Carl D. Rafoth.

James W. Ehrman, Youngstown, Ohio, for defendant Gregg DeSilvio.

Harry Hanna, Cleveland, Ohio, for Stewart Mandel.

Ronald L. Wollett, Columbus, Ohio, for defendant Frank Machinsky.

Ronald M. Rubenstein, Cleveland, Ohio, for defendant Mark Frissora.

Warren "Bo" Pritchard, Youngstown, Ohio, for defendants Gene Checcone and Dr. David Ritchie.

David A. Skrobot, Columbus, Ohio, for defendants Daniel A. and John D. Schwenker.

Conrad J. Morgenstern, Cleveland, Ohio, U.S. Trustee.

### MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause is before the Court upon the Trustee's Amended Complaint to recover property of the estate by avoiding allegedly

improper transfers. Summary judgment was granted against certain defendants on January 6, 1988, and the Trustee has resolved the claims against certain other defendants by settlement. Consequently, at the time of trial, the only claims awaiting a determination by this Court were those involving DR. DAVID RITCHIE, ("DR. RITCHIE"), DANIEL SCHWENKER ("D. SCHWENKER"), and JOHN SCHWENKER ("J. SCHWENKER"). A trial was commenced on January 11, 1988, and was concluded on January 14, 1988. This is a core proceeding brought pursuant to 28 U.S.C. Sec. 157(b)(2)(F), (H).

## I. BACKGROUND

BAKER & GETTY FINANCIAL SERVICES, INC., ("BGFS") was incorporated in August 1985 to operate as a full-service financial brokerage firm. It appears that STEVEN MEDVED and PHILIP CORDEK assumed the primary duties of organizing the business after it was initially incorporated. Neither of them was licensed to engage in securities transactions. Sometime in September 1985, D. SCHWENKER, who was licensed to engage in securities transactions, was hired to assist the organization and operation of the business. In December 1985, MR. MEDVED formed BAKER & GETTY DIVERSIFIED, INC. ("BGD"), which was intended to obtain and loan funds to BGFS and to develop real estate investment opportunities for customers of the brokerage firm. In May 1986, BAKER & GETTY SECURITIES, INC., ("BGS") was formed to replace both BGFS and BGD, in part because of the many problems encountered in licensing BGFS as a securities firm. D. SCHWENKER was both an officer and director of BGS. None of the Debtor companies actually conducted any business or had a source of income other than the funds which were obtained from the Defendants and by others similarly situated, either as an equity investment in BGFS or for the intended purchase of securities in the open market.

To attract business, investors were told that CORDEK's uncle, who resided in New York, had access to large blocks of common stock available for sale at a discount. The investors were told that, if purchased by them, the stock would be immediately sold at a profit and they would receive a substantial return on their principal investment. In reliance on these representations, Defendants and several other individuals sought to take advantage of these alleged investment opportunities by paying various sums to BGFS. It appears that D. SCHWENKER was given the opportunity to participate because he had not been paid the salary or benefits which CORDEK had promised to him when hired. On January 7, 1986, D. SCHWENKER tendered Twenty–Three Thousand, Two Hundred & 00/100 Dollars ($23,200.00) to CORDEK in order to participate in the alleged "block buys" of securities through CORDEK's uncle's contact. D. SCHWENKER subsequently received the return of his Twenty–Three Thousand, Two Hundred & 00/100 Dollar ($23,200.00) principal undertaking, along with a profit [1] of Sixty–Six Thousand, Four Hundred Fifty–Six & 93/100 Dollars ($66,456.93).[2]

J. SCHWENKER, D. SCHWENKER's father, received two different transfers from the Debtors. On February 6, 1986, J. SCHWENKER wire-transferred Four Hundred Ninety–Five Thousand & 00/100 Dollars ($495,000.00) to BGFS. Less than a month later, from February 24–26, J. SCHWENKER received a total return of both principal and profit of Six Hundred Fifty Thousand, One Hundred Five & 20/100 Dollars ($650,105.20) on his investment. This amounted to an annual return in excess of 620 percent. Subsequently, on March 25, 1986, J. SCHWENKER wire-transferred Five Hundred Thousand & 00/100 Dollars ($500,000.00) to BGFS for another "block buy" and received a total return of both principal and profit of Six Hundred Forty–Nine Thousand, Nine Hun-

[1] When reference in this Opinion is made to "profits," it should be understood to mean fictitious profits since the Debtors had no means of earning actual profits.

[2] Of these transfers to D. SCHWENKER, the Trustee is seeking to recover the total amount of $89,656.93, constituting both principal investment and alleged profits.

dred Eighty–One & 80/100 Dollars ($649,-981.80).[3] Similarly, DR. RITCHIE realized profits of Thirty–Seven Thousand, Four Hundred One & 62/100 Dollars ($37,401.62) in his dealings with the Debtor companies. No stock was ever actually purchased and all returns realized by the three Defendants were financed by the money received from newly attracted investors—a typical "Ponzi" scheme.[4] By November 1, 1986, various investors appear to have been defrauded of an estimated 2.5 Million & 00/100 Dollars.

The Trustee asserts that all profits and principal payments made by these Defendants ought to be recovered on the grounds that the payments constituted (1) preferential transfers voidable under Sec. 547(b) of the Code; or (2) fraudulent conveyances voidable under Sec. 548(a)(2) of the code; or (3) fraudulent conveyances voidable pursuant to Chapter 1336 of the Ohio Revised Code (the Uniform Fraudulent Conveyances Act).

## II. CLAIMS AGAINST DR. DAVID RITCHIE

■ From the evidence, it appears that DR. RITCHIE received a total return of Forty–Eight Thousand, Six Hundred Seventy–Six & 00/100 Dollars ($48,676.00) on original investments totalling Twenty–Two Thousand, Two Hundred Seventy–Four & 38/100 Dollars ($22,274.38). The original investment amount represents proceeds of sale of certain securities DR. RITCHIE turned over to BGFS for sale and reinvestment. BGFS sold the securities through a registered broker-dealer with which it had a working relationship. The Trustee seeks to recover from this Defendant the sum of Thirty–Seven Thousand, Four Hundred One & 62/100 Dollars ($37,401.62) as a

fraudulent conveyance pursuant to 11 U.S.C. Sec. 548(a)(2).[5] In order to prevail on a fraudulent conveyance claim under Sec. 548(a)(2), three elements must be shown. First, the Debtor must have an interest in the property transferred. Second, the transfer must have been made within one year before the date of the filing of the Petition. Finally, the Debtor must have been insolvent when the transfer was made and received less than a reasonably equivalent value in exchange for such transfer.

There is no doubt that the Debtor had an interest in the funds transferred. *In re Independent Clearing House Co.*, 41 B.R. 985, 999 (Bankr.D.Utah 1985). The conclusion that the transfers occurred while the Debtor was insolvent is supported by the testimony that Debtor Companies never conducted a business and that all funds Debtors ever had came from investors or persons believing they were purchasing securities on the open market. *In re Independent Clearing House Co.*, 41 B.R. 985, 1011 (Bankr.D.Utah 1985). The evidence shows that the transfers occurred within one year of the filing of the Petition. The only question is whether the Debtors received less than a reasonably equivalent value in exchange for the transfers. This Court subscribes to both the reasoning and conclusion reached by the District Court on appeal of the Bankruptcy Court decision in *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987) (*en banc*) on this issue. The court wrote:

From the time a defendant entrusted his money to the debtors, he had a claim against the debtors for the return of his money.... Thus, to the extent the debtor's payments to defendant merely repaid his principal undertaking, the pay-

---

**3.** Of these transfers to J. SCHWENKER, the Trustee is seeking to recover an amount equal to the profits realized on both conveyances ($305,087.00), plus an amount equal to his last principal undertaking ($500,000.00).

**4.** *See In re Independent Clearing House Co.*, 41 B.R. 985, 995, n. 12 *aff'd. in part, rev'd. in part*, 77 B.R. 843 (D.Utah 1987) (*en banc*) (Bankr. Utah 1988) for a description of the working of a typical "Ponzi" scheme and its historical background.

**5.** The Trustee calculates this amount by claiming Twelve Thousand, Four Hundred One & 62/100 Dollars ($12,401.62) in block buy profits, plus Twenty–Five Thousand & 00/100 Dollars ($25,000.00) from the Debtor's repurchase of BGFS stock from Defendant, for which Defendant originally paid Five Thousand & 00/100 Dollars ($5,000.00) on August 22, 1985.

ment satisfied an antecedent 'debt' of the debtors and the debtors received 'value' in exchange for the transfers. Moreover, to the extent a transfer merely repaid defendant's undertaking, the debtor received not only a 'reasonably equivalent value' but the exact same value—dollar for dollar. We therefore hold that such transfers are not avoidable under Sec. 548(a)(2).

*Id.* at 857. Thus, the Debtors received a "reasonably equivalent value" in exchange for all transfers to DR. RITCHIE that did not exceed his principal undertaking but, to the extent he received more than he gave the Debtors, the Debtors did not receive a reasonably equivalent value. DR. RITCHIE is therefore liable to the Trustee for any amount he received over his principal investment of Twenty–Two Thousand, Two Hundred Seventy–Four & 38/100 Dollars ($22,274.38).

■■■ The Trustee also argues that the transfers are avoidable under Sec. 544(b) in that an unsecured creditor could avoid them under the Ohio Fraudulent Conveyances Act.[6] The Trustee's argument is based upon Ohio Rev.Code Sec. 1336.04. This Section requires a creditor to prove that the transfers were made without "fair consideration." "Fair consideration" is defined in Ohio Rev.Code Sec. 1336.03, which reads:

> Fair consideration is given for property, or obligation:
>
> (A) When an exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or
>
> (B) When such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

For reasons previously discussed, we conclude that DR. RITCHIE gave "fair consideration," as defined in the Ohio Revised Code, for the transfers he received to the extent the transfers did not exceed his undertaking. Such transfers satisfied the Debtors' obligation to repay the undertaking. However, for the reasons previously discussed, we also conclude that DR. RITCHIE did not give valuable consideration for a transfer to the extent the transfer exceeded the amount of his undertaking. In this particular case, the Trustee's avoiding power under the Ohio Fraudulent Conveyances Act is no broader than it is under 11 U.S.C. Sec. 548(a)(2). Accordingly, Ohio Rev.Code Sec. 1336.04 cannot be used by the Trustee to recover the principal amounts invested by the Defendant. Thus, judgment will be granted in favor of the Trustee and against DR. RITCHIE in the sum of Twenty–Six Thousand, Four Hundred One & 62/100 Dollars ($26,401.62), plus applicable interest.

## III. CLAIMS AGAINST DANIEL & JOHN SCHWENKER

The Trustee seeks to recover from these Defendants both the profits and principal payments or invested amounts transferred to the Defendants from the Debtors.

### A. *Preferential Transfers*

The first ground urged for such a recovery is the Trustee's contention that the payments constitute preferential transfers to insiders pursuant to 11 U.S.C. Sec. 547(b).[7] Defendants have narrowed the contested issues to a considerable extent. The only element of Plaintiff's case which Defendants challenge is Sec. 547(b)(4), which sets forth certain time limitations. Preferential transfers made within ninety (90) days before filing may be recoverable. However, where the creditor is deemed to be an "insider", a preferential transfer

---

**6.** Since the Court has already determined that the Defendant's profits are recoverable by the Trustee pursuant to 11 U.S.C. Sec. 548(a)(2), this argument is only considered to determine whether it can provide a basis for recovery of the Defendant's original investment.

**7.** The Debtors' oral motion for a directed verdict on the Trustee's preference claim, which came at the conclusion of the Plaintiff's case-in-chief, will be overruled. The Court found sufficient evidence was adduced at trial to demonstrate *prima facie* the "insider" status of D. SCHWENKER.

made up to one year preceding the filing date may be recoverable. It is admitted that the questioned transfers occurred outside the ninety-day time period but within the one-year bar date. Thus, the remaining issue is whether or not the Defendants may be characterized as "insiders," thereby bringing the Defendant's transfers within the ambit of the time limitations contained in Sec. 547.

■ 1. *Insider Status.* 11 U.S.C. Sec. 101(30) defines an "insider," in part, as:
  B. If the debtor is a corporation—
    (i) director of the debtor;
    (ii) officer of the debtor;
    (iii) person in control of the debtor;
    (iv) partnership in which the debtor is a general partner;
    (v) general partner of the debtor; or
    (vi) relative of a general partner, debtor, officer, or person in control of the debtor.

D. SCHWENKER admits his position as an officer and, thus, an insider, of BGS. The Trustee argues that the Court's prior Order of substantive consolidation should necessarily result in the insider of any debtor being considered an insider of all debtors. *In re Baker & Getty Fin. Services,* 78 B.R. 139 (Bankr.N.D.Ohio 1987). The contention must fail because the Court's Order approving substantive consolidation did not include a factual finding that the Debtors constituted a single corporate operation. Rather, it was on a motion to substantively consolidate the estates of PHILIP CORDEK and his wife with the estates of BGFS, BGD and BGS. It simply does not follow that an insider of one entity should *ipso facto* be deemed an insider of all entities because of the entry of that consolidation Order. While a finding that the Debtors enjoyed a unity of ownership, direction or control may be a factor in considering consolidation, such a finding is not a prerequisite to a substantive consolidation Order. The issues are similar, but not identical. Moreover, the Court is loath to foreclose a possible defense of the Defendants based upon a hearing and Order regarding

which these Defendants had neither notice nor an opportunity to contest. The Court will consider the merits of the Defendants' contention that each corporate Debtor must be viewed separately. However, if the Court finds that the evidence in *this* proceeding demonstrates a functional unity between the corporate Debtors, then D. SCHWENKER's admission of insider status as to one of the corporate Debtors would be persuasive evidence that the Defendant ought to be deemed an insider as to all the corporate Debtors.

■ Defendants argue that D. SCHWENKER was not an officer, director, or person in control of BGD. However, testimony revealed that BGD conducted no business and only existed as a name on a bank account. BGD never had any employees, officers, or directors, and so it follows that D. SCHWENKER was never an employee, officer, or director of BGD. However, since the primary purpose of forming BGD was for it to loan money to BGFS, any officer, director or person in control of BGFS ought to be deemed the same for BGD.

Defendants further contend that D. SCHWENKER was not an officer, director or person in control of BGFS. The Trustee points out evidence to the contrary. Uncontroverted testimony reveals that D. SCHWENKER was the sole experienced and licensed broker at BGFS and that he monitored and supervised the progress of employees PHILLIP HAMMOND and DAVID PERHAM. As employees of BGFS, Mr. Hammond and Mr. Perham first studied to obtain appropriate securities licenses and later, after becoming licensed, they engaged in sales for BGFS. Testimony also showed that D. SCHWENKER had input and control over both office procedures and preparation of a broker compensation plan. D. SCHWENKER was identified as a vice-president of the Company by MR. CORDEK, MR. HAMMOND, the sales brochure, business cards, and the organizational chart prepared by MR. MARK FRISSORA.[8] Defendants' protestations that D.

8. The Defendants challenge certain materials

prepared by Mr. Frissora on the basis that D.

SCHWENKER was not to become an officer until BGFS obtained broker-dealer status is belied by the fact that he subsequently became both President and a director of BGS, although it never attained the status of a licensed broker-dealer.

■ Defendants contend that the lack of adherence to corporate formalities in electing officers and directors must insulate D. SCHWENKER from liability. In spite of the lack of formalities in the organization of the corporation, D. SCHWENKER may be liable as a *de facto* officer or director.[9] In *In re Holiday Isles, Ltd.*, 29 B.R. 827 (Bankr.S.D.Fla.1983), the court wrote:

> Since a *de facto* corporate director or officer is treated in all respects as a de jure director or officer, he is subject to the fiduciary duties of a de jure director or officer. [citation omitted] Accordingly, he cannot set up as a defense to an action for mismanagement of the corporation the fact that he is not a de jure director or officer.

*Id.* at 830. Similarly, in this case, the Court rejects the Defendants' argument that the lack of slavish adherence to corporate formality should serve to place D. SCHWENKER outside the ambit of responsibility as an "insider".

■ Defendants also cite testimony suggesting D. SCHWENKER had no ultimate authority at BGFS. While the Court recognizes that MR. MEDVED and MR. CORDEK appeared to have the ultimate authority at BGFS, the Court has no doubt whatsoever that D. SCHWENKER exercised more control and assumed greater responsibility than did a common employee. The Court believes D. SCHWENKER's ascension to President of BGS is indicative of the extent of his control or status at BGFS since the evidence shows that BGS was simply a reconstituted BGFS. The employees, principals and business transactions of the two companies were virtually identical. Based on a review of the evidence submitted, the Court believes that the Corporate Debtors were, in fact, operated as one entity. This, in turn, leads to the Court's conclusion that D. SCHWENKER had a sufficiently close relationship with each of the Corporate Debtors to qualify as an "insider," as that term is defined in 11 U.S.C. Sec. 101(30). Therefore, J. SCHWENKER must also be considered an insider based on his paternal relationship to D. SCHWENKER. 11 U.S.C. Sec. 101(30)(B)(vi).[10] Consequently, payments made to the Defendants appear to be voidable by the Trustee pursuant to 11 U.S.C. Sec. 547(b).

■ 2. *Sec. 547(c)(2) Exception.* The Defendants urge further that 11 U.S.C. Sec. 547(c)(2) will insulate the pre-Petition transfers from invalidation as a preference. The passage provides that:

> (c) The trustee may not avoid under this section a transfer—
>
> .    .    .    .    .
>
> (2) to the extent that such transfer was—
>
> A. in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> B. made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> C. made according to ordinary business terms.

---

SCHWENKER did not participate in the preparation of the items. However, D. SCHWENKER's presence is immaterial. The items indicate, in any case, that D. SCHWENKER was considered and was held out as an officer of BGFS by that entity.

**9.** Filing of the Articles of Incorporation for all three entities and acceptance of those documents by the Secretary of State confer *de facto* status on the corporation and its directors and officers. *See State v. Toledo & Lucas Cty. Burial Ass'n*, 18 Ohio Cir.Dec. 397, 410 (Ct.App.1906).

**10.** The Court is mindful that the application of the definition of "insider" is arguably a hardship as to J. SCHWENKER. Nevertheless, inequities in the application of clear provisions of law must be addressed to and remedied by Congress and not by the courts. This Court, as a court of equity, "may not create new substantive rights under the guise of doing equity". *In re Independent Clearing House Co.*, 41 B.R. 985, 1005–06 (Bankr.D.Utah 1984).

The Trustee objects to application of Sec. 547(c)(2) to Ponzi scheme transactions, urging that congressional intent behind the passage was to protect trade creditor transactions, not Ponzi scheme payments. However, an act of Congress to remedy a particular situation does not, *ipso facto,* invalidate its application to other situations to which the act may be found to apply. The Trustee also argues that overriding equitable considerations demand the return to Debtor's estate of all transfers in order to equally treat all creditors. The Court is mindful that Sec. 547 was enacted to discourage the race to the courthouse and promote the equal treatment of creditors. However, Congress has determined that not all transfers by the Debtor threaten to undermine these dual purposes. Transfers in the ordinary course of the Debtors' business are presumably of this kind. Admittedly, the Court is faced with conflicting case law concerning the relevancy of this exception to Ponzi scheme payments. The courts in *In re Western World Funding, Inc.,* 54 B.R. 470 (Bankr.D.Nev.1985); *Graulty v. Brooks* (*In re Bishop, Baldwin, Rewald, Dillingham & Wong*), 819 F.2d 214 (9th Cir.1987); and *Danning v. Bozek* (*In re Bullion Reserve of North America*), 836 F.2d 1214 (9th Cir.1988) conclude this exception to be inapplicable to Ponzi scheme payments, while the District Court decision in *In re Independent Clearing House Co.,* 77 B.R. 843 (D.Utah 1987) (*en banc*), held otherwise.[11] We believe the better analysis to be the position taken by the courts in *Western World Funding, Bullion Reserve of North America* and *In re Bishop,* based on our reading of Sec. 547(c)(2)(C).

The Ninth Circuit, we believe, correctly stated the applicable analysis:

> The appellant contends that her $3,000.00 withdrawal was consistent with 'normal financial relations between herself and the debtor'. But, the fact that there exists a history of similar transactions between the debtor and creditor does not establish that the latest payment is within the 'ordinary course of financial affairs' of the debtor. Assuming Brooks was an innocent investor who thought she was dealing with a legitimate investment venture, the payment may have been within the 'ordinary course' as to her. But, section 547 also requires that the payments were made in the ordinary course of business or financial affairs of the debtor.

> We agree with bankruptcy courts that have addressed the issue that Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2):

>> To apply [section 547(c)(2)] to immunize these activities 'would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims.' [citing *Independent Clearing House,* 41 Bankr, at 1004]. These defendants received the funds from investments made on the eve of bankruptcy, by persons who received nothing. Equity requires that these creditors all share equally in whatever assets are available. If decisions such as this and *Clearing House* help to discourage these Ponzi arrangements by encouraging more careful investment activities on the part of the ordinary 'consumer investor', there will be fewer defrauded creditors to sit at the defendant's table in preference suits in the future.

> *Western World Funding,* 54 Bankr. at 481 (citation omitted). *See also Independent Clearing House,* 41 Bankr. at 1014–15.

819 F.2d at 217.

■ The Defendants also contend that equity favors a finding of no liability. However, Congress has legislated a balancing mechanism within the framework of Sec. 547, and the Court can find no authority for rewriting these legislative provisions. It is an accepted maxim of equity jurisprudence that equity adopts and follows established rules of law. *Black's Law*

---

**11.** Contrary to the Trustee's assertion, the district court did hold that Sec. 547(c)(2) could be applied to Ponzi scheme transfers.

**800**

*Dictionary* 485 (5th Ed.1979). Where the statutory rules are, as here, so unequivocal, it would be judicial folly to avoid their application on claimed equitable grounds. Judicial rule-making is not favored, regardless of the good intentions of the Court.

It is difficult to believe that D. SCHWENKER, within the factual framework here found, had no knowledge or reason to inquire of the financial woes which the Debtors were experiencing. His participation in the "block buy" was a result of his not being paid the promised compensation and benefits by BGFS. Furthermore, as President of BGS, we believe that he had either direct or indirect influence in securing for both himself and his father the final payments they both eventually received. Moreover, the Court considers J. SCHWENKER to be at the least on inquiry notice concerning the transactions. J. SCHWENKER testified that he had considerable experience as a practicing attorney representing one or more clients in the savings and loan industry since his admittance to the Ohio Bar in 1949. After receiving a phenomenal 30 percent (30%) return within twenty (20) days on his initial investment,[12] J. SCHWENKER had

> knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt him to pause and inquire before consummating the transaction....

37 C.J.S., *Fraudulent Conveyances,* Sec. 126 (1943).

The disputed transfers of funds from the Debtors to both D. SCHWENKER and J. SCHWENKER are voidable preferential transfers to insiders which do not fit within the exception in Sec. 547(c). The Trustee may recover the full amount received by D. SCHWENKER and the profits and second principal investment by J. SCHWENKER as preferential transfers to an insider voidable under Sec. 547(b).

**12.** This amounts to an annual return of 600 percent (600%), which J. SCHWENKER acknowledged, on cross-examination, to be a very

*B. Fraudulent Transfers*

Since the Court has determined that the Trustee may recover the disputed transfers under 11 U.S.C. Sec. 547, we find it unnecessary to consider whether the payments are also voidable pursuant to either 11 U.S.C. Sec. 548 or Ohio Rev.Code Ann. Sec. 1336.01, *et seq.*

## IV. PREJUDGMENT INTEREST

Where the Trustee has successfully set aside preferential transfers, the Trustee is entitled to pre-judgment interest from the earlier of the date upon which demand is made for return of the preference or the commencement of the adversary proceeding. *In re Independent Clearing House Co.,* 41 B.R. 985, 1015 (Bankr.D.Utah 1984).

In post-trial briefs, the Trustee and the Defendants both reference Sec. 1343.03 of the Ohio Revised Code as it regards pre-judgment interest. Because the Trustee's right to recover a preferential transfer arises under and is governed by federal law, federal law governs the appropriate rate of interest. *In re H.P. King Co., Inc.,* 64 B.R. 487, 490 (Bankr.E.D.N.C. 1986). Although 28 U.S.C. Sec. 1961 does not address pre-judgment interest, many courts have adopted the Sec. 1961 post-judgment rate in determining pre-judgment interest. *In re Foreman Ind. Inc.,* 59 B.R. 145, 147 (Bankr.S.D.Ohio 1986); *In re Production Steel Inc.,* 60 B.R. 4, 5 (Bankr.M.D.Tenn.1986). The Court believes the Trustee would be fairly compensated by use of the post-judgment interest rate. Accordingly, the rate of pre-judgment interest shall be equal to the coupon issue equivalent of the average accepted auction price for the last auction of 52–week U.S. Treasury bills settled immediately prior to the date of commencement of this action. This adversary action was filed on June 9, 1987. As no proof of a pre-filing demand was offered by Trustee, the Trustee is entitled to pre-judgment interest from June 9, 1987.

favorable return, which encouraged his further participation.

An appropriate Order shall issue.

IT IS SO ORDERED.

### ORDER

This cause came on for consideration of the Court upon the Trustee's Amended Complaint seeking to recover property of the estate by avoiding allegedly fraudulent or preferential transfers made to DR. DAVID RITCHIE, MR. DANIEL SCHWENKER, and MR. JOHN SCHWENKER.

Judgment is hereby granted in favor of the Trustee and against DR. DAVID RITCHIE in the sum of Twenty–Six Thousand, Four Hundred One & 62/100 Dollars ($26,-401.62) pursuant to 11 U.S.C. Sec. 548(a)(2). Judgment is rendered against MR. DANIEL SCHWENKER in the amount of Eighty–Nine Thousand, Six Hundred Fifty–Six & 93/100 Dollars ($89,656.93) and against MR. JOHN SCHWENKER in the amount of Eight Hundred Five Thousand, Eighty–Seven & 00/100 Dollars ($805,-087.00) pursuant to 11 U.S.C. Sec. 547(b)(2). In addition, pre-judgment interest is awarded to the Trustee on each of the above amounts from June 9, 1987, calculated pursuant to 28 U.S.C. Sec. 1961.

IT IS SO ORDERED.