In re UNITED ENERGY
CORPORATION, Debtor.
(Two Cases)

C.H. RIDER & FAMILY, C.H. Rider
and Thomas A. Rider, Appellants,

v.

Frederick S. WYLE, as Trustee of United
Energy Corporation and Trustee of Re-
newable Power Corporation, Appellee.

ABCD ENTERPRISES, et al., Martin and
Barbara Altbaum, Land and Solar
Partners, et al., Plaza Investors V and
Cris C. Cris, and Jeanne Bauer, et al.,
Appellants,

v.

Frederick S. WYLE, as Trustee of United
Energy Corporation and Trustee of Re-
newal Power Corporation, Appellee.

BAP Nos. NC–87–1843 VMoP, NC–87–
2262 VMoP, NC–87–2263 VMoP, NC–87–
2264 VMoP, NC–87–2265 VMoP and
NC–87–2287 VMoP.
Bankruptcy No. 3–85–00636 LK.
Adv. Nos. 3–86–0409 LK, 3–86–0408 LK,
3–86–0412 TC, 3–86–0413 LK, 3–86–0414
TC.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted July 22, 1988.

Decided Aug. 11, 1989.

Frank R. Ubhaus, Ubhaus & Collins,
P.C., San Jose, Cal., Iain A. MacDonald,

Goldberg, Stinnett & MacDonald, San Francisco, for appellants.

Patricia S. Mar, Feldman, Waldman & Kline, San Francisco, Cal., for appellee.

Before VOLINN, MOOREMAN and PERRIS, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

We consider here various related appeals. In BAP No. NC–87–1843, appellants C.H. Rider and Family, a partnership, and C.H. Rider and Thomas A. Rider, individually (hereinafter referred to collectively as Rider), purchased solar energy production modules from debtor United Energy Corporation (hereinafter UEC). The modules were to be paid for by sale of their power production to a related debtor, Renewable Power Corporation (hereinafter RPC). The debtor corporations were instruments in a Ponzi scheme [1] whereby the modules never produced power and RPC, the ostensible purchaser of the power, made payments on the basis of fictitious invoices. In fact, the payments made to module owners were derived from payments made by later purchasers of modules. Ultimately, UEC filed a Chapter 11 bankruptcy and RPC was involuntarily petitioned into bankruptcy by the UEC trustee. Rider appeals from a judgment allowing the trustee to recover the payments he received for fictitious power on the theory that the payments were fraudulent transfers since no consideration was furnished therefor.

In BAP Nos. NC–87–2262, NC–87–2263, NC–87–2264, NC–87–2265, and NC–87–2287 (hereinafter consolidated appeals), appellants ABCD Enterprises, Martin and Barbara Altbaum, Land and Solar Partners, Plaza Investors V and Cris C. Cris, and Jeanne Bauer, respectively, were also investors in the debtor's Ponzi scheme. They appeal from partial summary judgments allowing the trustee to recover power payments, which were held as in the Rider adversary to be fraudulent transfers for lack of consideration. For the reasons set forth below we hold that the rulings on appeal should be reversed.

## FACTS

UEC, a Hawaii corporation, began selling solar modules in 1982, primarily to California investors. The modules were purported to produce electricity and thermal energy (hot water). The purchase price for each module was $30,000 to $40,000. Purchasers generally made a down payment of 35% to 43% of the purchase price, the balance financed by long-term, primarily nonrecourse promissory notes payable to UEC in semiannual or annual installments secured only by the modules. Over a three-year sales period, from 1982 to 1985, UEC sold some 5,323 modules for gross sales of over $200 million. UEC collected cash of approximately $83.5 million, of which $66.7 million was from down payments made at the time of purchase and $16.8 million was from installment payments on the promissory notes. The note payments were amortized over a twenty to thirty-year period.

A principal feature of sales promotion was the relationship of solar energy production to the tax structure. The down payment, and more, could be and in many

---

**1.** In a Ponzi scheme, fictitious profits are paid to investors from the principal sums deposited by subsequent investors. The term derives from "the remarkable criminal financial career of Charles Ponzi." *Cunningham v. Brown*, 265 U.S. 1, 7, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924). Ponzi sold promissory notes in 1919 and 1920 offering a 50% profit in ninety days, based on the false tale that he was buying and selling international postal reply coupons in foreign countries at a 100% profit due to excessive differences in the rates of exchange following the war. No investments were ever made, but lending to Ponzi was stimulated to the level of one million dollars a week by Ponzi's practice of paying notes in full in forty-five days, or paying notes presented in less than forty-five days at 100% of the loan. Report of Ponzi's insolvency precipitated a run on his offices by lenders seeking repayment and, shortly, an involuntary bankruptcy. 265 U.S. at 7–8, 44 S.Ct. at 425. Defendant-investors unsuccessfully resisted attempts by the trustees to recover repayments of their funds as unlawful preferences in *Cunningham*. For further information on Charles Ponzi's career, see *In re Independent Clearing House, Inc.*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984), *aff'd in part, rev'd in part*, 77 B.R. 843 (D.Utah 1987), and works cited therein.

instances was recovered by federal and state income tax credits.[2]

At the time of purchase, every module purchaser was offered a contract to sell RPC the power which was to be generated. The sole shareholder of RPC was Delphine Lampert, also the sole shareholder of UEC. Her husband, Ernest Lampert, was president of both corporations. RPC was to operate three solar farms at Davis, Borrego Springs, and Barstow, California, where the modules would be located. The contracts with RPC obligated it to purchase, at specified prices per kilowatt and therm, such power as would be produced by the modules and delivered to RPC. The UEC promotional literature advertised that the electricity purchased by RPC would be sold to utilities and that the thermal energy would be used at the solar farms for various business activities of RPC. All but one of the 4,500 module purchasers contracted with RPC to place their modules at one of the solar farms and sell their power to RPC.

Despite sales of thousands of modules, only $3,400 worth of electric power was ever produced for sale to utilities. Consistent with Ponzi strategy, the debtors sold modules to successive waves of customers, for whom they fabricated fictitious kilowatt hours, paying therefor with proceeds of successive module sales. From these proceeds, RPC sent payments totaling $4,754,936, based on false invoices, to module owners. The payments were made quarterly through 1983 and the first three quarters of 1984, in amounts of approximately $300 to $400 per module. Module owners were sent utility-like notices which contained identical kilowatt and therm meter readings for each of the modules. Because RPC had no income or assets of its own, UEC lent funds to another Lampert-owned entity, United Financial Corporation, which in turn lent the funds to RPC for making power payments.

The tax credits and power payments created an illusion of credibility, which ended when the California Department of Corporations filed suit against UEC in state court for the illegal sale of securities. RPC ceased making the power payments after the third quarter of 1984, but certain payments by module purchasers on the notes continued until appointment of the bankruptcy trustee in September, 1985. UEC also was able to continue to sell modules to investors seeking year-end 1984 tax shelters, notwithstanding a disclosure, made pursuant to the terms of a preliminary injunction obtained in the state litigation, of the fictitious basis of the power payments.

In April, 1985, UEC filed a voluntary petition for relief under Chapter 11. RPC was involuntarily petitioned into a proceeding as a debtor in December of that year by Frederick S. Wyle as trustee in bankruptcy for UEC. Wyle then served as trustee for both debtors and is appellee in the appeals before us. As trustee, he filed several adversary proceedings to recover the RPC power payments for the estate on the legal theory that those payments were fraudulent transfers.

*BAP No. NC–87–1843 (Rider appeal).* In 1982, appellant Rider invested in debtors' Ponzi scheme. Rider purchased ten solar modules from UEC for $300,000. Rider paid $120,000 down and later made a total of $39,127.20 in payments on an installment note for the balance. Rider separately executed a power sales agreement with RPC whereby Rider would receive payments for power generated by the mo-

2. Federal legislation enacted in 1978 provided income tax credits for the purchase of qualified solar energy equipment. Energy Tax Act of 1978, Pub.L. No. 95–618, § 301(a)(1), 92 Stat. 3174, 3194–95. The tax credit was later expanded to allow use of nonrecourse notes to finance up to 80% of the purchase price of qualified equipment. Pub.L. No. 97–34, § 211(f)(1), 95 Stat. 172, 229–33 (1981). A total of 25% in tax credits was provided, consisting of a 15% solar energy tax credit and a 10% investment tax credit. California law provided an additional 25% solar energy tax credit. Cal.Rev. & Tax Code § 17052.4 (West 1983). Thus, a California taxpayer would be entitled to total tax credits of 50% of the purchase price of qualified equipment. In addition, depreciation deductions would be available under both federal and California tax law. Appellee advises, however, that the Internal Revenue Service has challenged the tax credits and deductions claimed by UEC investors.

dules. Rider eventually received $23,980.40 as power payments. After UEC and RPC became involved in bankruptcy proceedings, the trustee filed an adversary proceeding against Rider to recover the power payments as fraudulent transfers. The matter was tried and judgment was rendered allowing the trustee to recover the power payments from Rider. Findings of fact and conclusions of law were entered. Rider timely appealed.

*BAP Nos. NC–87–2262, NC–87–2263, NC–87–2264, NC–87–2265, and NC–2287 (consolidated appeals).* The ABCD Enterprises case involves several hundred module purchasers who were named as defendants in the adversary proceeding brought by the trustee. The other appellants in the consolidated appeals, Martin and Barbara Altbaum, Land and Solar Partners, Plaza Investors V and Cris C. Cris, and Jeanne Bauer, were sued separately by the trustee because of the size of the claims against them. Each of the appellants purchased modules and received payments for the production of fictitious power. After commencement of the bankruptcy proceedings, the trustee filed an adversary proceeding against them to recover the power payments as fraudulent transfers. In each of the adversary proceedings, partial summary judgment was granted to the trustee allowing him to recover the power payments. Findings of fact and conclusions of law were entered. Each appellant timely appealed.

## STANDARD OF REVIEW

■ The essential facts are not in dispute. We review the bankruptcy courts'

conclusions of law derived therefrom *de novo. In re Torrez,* 63 B.R. 751, 753 (9th Cir. BAP 1986), *aff'd,* 827 F.2d 1299 (9th Cir.1987). Grants of summary judgment are also reviewed *de novo. Gross v. Petty (In re Petty),* 93 B.R. 208 (9th Cir. BAP 1988). Findings of fact made in summary judgment proceedings are not entitled to the "clearly erroneous" standard of review because the trial court has not weighed the evidence in the conventional sense. *Am. Fed'n of State, County and Mun. Employees v. Stephens (In re Stephens),* 51 B.R. 591, 594–95 (9th Cir. BAP 1985).

## DISCUSSION

### A. Fraudulent Transfer Statutes

■ A bankruptcy trustee can avoid fraudulent transfers pursuant to state law and/or provisions of the Bankruptcy Code. Section 544(b) of the Bankruptcy Code allows the trustee to avoid any transfers of a debtor's property, which would be avoidable under state law,[3] and section 548 provides a federal statutory basis for avoiding fraudulent transfers.

California law and the Bankruptcy Code contain similar definitions of fraudulent transfer. Under the provisions of both statutes, a transfer made by a debtor is fraudulent as to a present creditor if the debtor did not receive a "reasonably equivalent value" in exchange for the transfer and was either insolvent at the time of the transfer or was engaged in business with unreasonably small capital.[4]

---

**3.** 11 U.S.C. § 544(b) (1982) provides as follows:
  The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

**4.** Applicable provisions of the California Civil Code read, in part:
  § 3439.04 *Transfers fraudulent as to present and future creditors*
  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was in-

curred, if the debtor made the transfer or incurred the obligation as follows:

    .    .    .    .    .

  (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
  (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. . . .
  § 3439.05 *Transfers fraudulent as to present creditors*
  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor

Rider stipulated at trial, and the court found, that UEC and RPC were insolvent and were engaged in business with unreasonably small capital at the time of each of the power payments to Rider. With respect to the rulings leading to the consolidated appeals, a trial was held on the insolvency issue simultaneously in all four adversary proceedings. The court found that the debtors were insolvent at the time of all of the transfers in question. Appellants have not challenged this ruling on appeal.

The courts found that the power payments were received by all appellants in the good faith belief that they represented payment for power actually produced from the modules. Thus, the basic issue before us is whether the debtors received a reasonably equivalent value in exchange for the power payments to appellant-investors in the debtors' Ponzi scheme.

### B. Definition of "Value"

"Value" is defined by the Bankruptcy Code as "property, or satisfaction or securing of a present or antecedent debt of the debtor". 11 U.S.C. § 548(d)(2)(A).[5] Appellant Rider contends that a debt owing from UEC to Rider arose at the moment Rider paid the purchase price for the solar modules to UEC in reliance on fraudulent misrepresentations made by UEC. Rider maintains that value was given for the power payments because they satisfied an antecedent debt. Rider paid UEC a total of $159,217.20 for purchase of the solar modules and this amount far exceeded the power payments to Rider of $23,980.40. The bankruptcy court disagreed with Rider's analysis in the following finding of fact:

37. While module purchasers may have claims against UEC or RPC for

made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Section 548(a) of the Bankruptcy Code contains similar language, but limits the trustee's avoidance powers to transfers made within one year of the filing of the petition.

fraud, breach of warranty, and other causes of action, these claims were not satisfied, and were not intended to be satisfied, in whole or in part, by the power payments. The power payments were not paid by RPC in exchange for any claims that module purchasers may have had against UEC for refund of their purchase price for fraud or on any other grounds.

The court recognized that an antecedent debt may have been owed to Rider by UEC because of Rider's purchase of the defective modules. Because the power payments to Rider were not explicitly made in satisfaction of any antecedent debt, the court concluded that value was not received by debtors for the power payments.

Similarly, appellants in the consolidated appeals argue that a defrauded investor has the right to recover his initial investment and that such a claim may form the basis of an antecedent debt. They also contend that the two agreements—one for the purchase of modules and the other for payments from RPC for the sale of power—are the equivalent of an indivisible "investment contract" wherein the module purchasers bargained for an income-producing investment. If this argument is correct, then the down payments and note payments could serve as consideration for the power payments. The bankruptcy courts, however, concluded that appellants did not make the down payments and note payments under their purchase agreements in exchange for the power payments or any promise of income from the operation of the modules.

Appellants primarily rely on two cases, *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985 (Bankr.

5.  Compare the similar definition under California law:

§ 3439.03  *Value*
    Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

D.Utah 1984), *aff'd in part, rev'd in part,* 77 B.R. 843 (D.Utah 1987); and *Eby v. Ashley,* 1 F.2d 971 (4th Cir.1924), *cert. denied,* 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925). In *Independent Clearing House,* the debtor perpetrated a Ponzi scheme whereby investors contracted with the debtor to commit funds for nine months, at the end of which time the investors' principal would be returned. The investors were entitled to receive either a fixed monthly payment during the nine-month period or a lump sum payment of interest at the end of the nine-month period. 41 B.R. at 994. The debtor was supposed to use the investors' funds to assume and pay accounts payable on behalf of various client companies. Profits were to be made by negotiating reduced payments with the creditors of the client companies. *Id.* at 993–94.

No client companies actually existed and no profits were ever earned by the debtor. In classic Ponzi fashion, early investors were repaid their principal in full, plus fictitious profits, while other investors received some payments but less than the amount of their investments, and later investors received nothing. The bankruptcy court ruled that the payments to investors could not be recovered by the bankruptcy trustee on the basis that they were fraudulent transfers because the debtor received "reasonably equivalent value" via satisfaction of its contractual debt to repay the investors' principal. *Id.* at 1007. Its ruling was affirmed by the district court on appeal. 77 B.R. at 857.

The bankruptcy court in the Rider appeal concluded that the *Independent Clearing House* case was distinguishable in the following conclusion of law:

13. The Trustee's recovery of the power payments is not limited to payments in excess of the amounts paid by module purchasers in down payments or note payments. *In re Independent Clearing House,* 41 B.R. 985 (Bankr.D. Utah 1984) is distinguishable, in that the debtor in that case had a contractual obligation to return the principal paid by the investors, and, therefore, the debtor's payments to the investors satisfied an antecedent contractual debt. There was no contractual obligation by UEC or RPC to return the module purchasers' investments. Requiring that the Trustee apply the power payments as an offset against the module purchasers' investments would constitute an impermissible offset of a general unsecured claim against a fraudulent conveyance.

The bankruptcy courts in the consolidated appeals entered similar conclusions of law. The district court in *Independent Clearing House* noted, however, that the antecedent debts to the investors in that case could be based on either their contracts with the debtors or their rights to restitution. 77 B.R. at 857 & n. 24. It also stated, in *dicta,* that had no contract existed, the investors would have had claims for restitution. *Id.* The district court did not analyze, as we must here, whether such restitution claims would have been satisfied.

*Rafoth v. Bailey (In re Baker & Getty Financial Services, Inc.),* 88 B.R. 792, 795–96 (Bankr.N.D.Ohio 1988) followed *Independent Clearing House* in refusing to allow a bankruptcy trustee to recover repayments of principal to investors in a Ponzi scheme. The court simply stated, "[s]uch transfers satisfied the Debtors' obligation to repay the principal." *Id.* at 796. It did not analyze whether the nature of the debtor's obligation originated in contract or restitution.

In the second case relied on by appellants, *Eby,* the debtor, Frank M. Young, conducted a "blind pool" Ponzi scheme wherein the debtor collected a total of over four million dollars from more than 5,000 customers. Ashley paid $3,000. The funds were to be used to buy and sell securities traded on the New York Stock Exchange. Investors had a right to withdraw all of their funds on thirty-days' notice. The funds were never invested in securities and no profits were generated. The debtor nevertheless paid Ashley fictitious profits of $1,576.68. Ashley also obtained repayment of his $3,000 principal.

The bankruptcy court in *Eby* applied an "equity rule of equality" and held that the

trustee could recover the $1,576.68 profit payment to Ashley, but not the $3,000 repayment of his principal. The court applied this concept in the absence of any fraudulent transfer statute comparable to section 548(a)(2) of the current Bankruptcy Code.[6]

We believe that the holdings of *Independent Clearing House* and *Eby* point to the result in this case. In a suit for damages, the power payments given to the defrauded investors would be deemed to partially satisfy or release fraud or restitution claims. *See id.* at 857 n. 2 (citing Restatement of Restitution § 1 (1936); Restatement (Second) of Contracts §§ 164 & 376 (1979) (in the absence of a valid contract, investors prior to repayment would have a claim for restitution to prevent unjust enrichment; if the investment agreement was valid, but investors were fraudulently induced to enter into the contract, rights to restitution still would arise). Satisfaction of such claims would constitute value given for the receipt of the power payments within the meaning of section 548(d)(2)(A) or the comparable California provision.

As an alternative basis for finding that value was given, we view the two agreements with investors as indivisible. In entering into such a transaction, the obvious intent of the parties was not confined to purchase or sale of the modules. Appellants were led to believe and expected that their down payments and note payments would be covered by the power payments, which would not only liquidate their non-recourse obligations for the modules, but also ultimately provide them with a profit.

We recognize recent decisions of the Ninth Circuit, holding that creditors although defrauded in Ponzi schemes were nevertheless recipients of preferential transfers subject to avoidance when payments were received within ninety days of bankruptcy. *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214 (9th Cir.1988), *cert. denied,* —— U.S. ——, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214 (9th Cir.1987). In *Graulty*, the court stated:

> To apply [the ordinary course of business exception to avoidable preferences] to immunize these activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." (Citing *Independent Clearing House*, 41 B.R. at 1004.) These defendants received the funds from investments made on the eve of bankruptcy, by persons who recovered nothing. Equity requires that these creditors all share equally in whatever assets are available.

819 F.2d at 217 (quoting *In re Western World Funding, Inc.*, 54 B.R. 470, 481 (Bankr.D.Nev.1985)). These cases are distinguishable since they concerned preferential transfers pursuant to 11 U.S.C. § 547. Payment on an antecedent debt is ordinarily not recoverable as a fraudulent transfer, the debt being deemed valid considerations for such payment. 11 U.S.C. § 548(d)(2)(A).

## CONCLUSION

It might initially appear that the parties defrauded by debtors were involved in discrete transactions, one for the purchase of power-generating devices, the other for the sale of power to a different entity. The Lamperts' purpose was to create the illusion of an investment which would provide a fail safe method of return. The investors

---

**6.** The court in *Eby* stated, "No solution of the question is offered by any provision of the bankruptcy statute. It therefore becomes necessary for the court of bankruptcy to apply principles of equity appropriate to the facts in the ascertainment of the claims and the distribution of the funds in its hands." 1 F.2d at 972 (quoting *Abrams v. Eby [In re Young]*, 294 F. 1, 3 (4th Cir.1923)). The applicable provision of the former Bankruptcy Act in 1924 allowed a trustee to avoid a fraudulent conveyance where there was intent by the debtor to hinder, delay, or defraud creditors, and to avoid fraudulent conveyances pursuant to the state law of the situs of the property. See discussion in 4 *Collier on Bankruptcy* ¶ 548.01 (15th ed. 1988). There was no equivalent in the Bankruptcy Act to section 548(a)(2), allowing the avoidance of transfers where the debtor was insolvent and received less than a reasonably equivalent value in exchange.

were led to believe that purchase of generating units would be funded by tax credits and the sale of power. The separate entities created by the Lamperts were· components of a single fraudulent scheme. The agreement for the purchase of modules and the agreement for the sale of power were thus parts of an indivisible investment contract. The debtors received reasonably equivalent value in exchange for the Ponzi payments, which were made to defrauded appellant-investors, within the meaning of section 548(a)(2).

REVERSED and REMANDED for further proceedings consistent herewith.