In re UNITED ENERGY CORP., Debtor.

Frederick S. WYLE, as Trustee of United Energy Corporation and Trustee of Renewable Power Corporation, Appellant,

v.

C.H. RIDER & FAMILY; C.H. Rider; Thomas A. Rider, Appellees.

In re UNITED ENERGY CORP., Debtor.

Frederick S. WYLE, as Trustee of United Energy Corporation and Trustee of Renewable Power Corporation, Appellant,

v.

ABCD ENTERPRISES, et al., Appellees.

Nos. 89–16281, 89–16505.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1991.

Decided Sept. 13, 1991.

Patricia S. Mar, Feldman, Waldman & Kline, San Francisco, Cal., for appellant.

Frank R. Ubhaus, Ubhaus & Collins, San Jose, Cal., and Iain A. Macdonald, Goldberg, Stinnett & Macdonald, San Francisco, Cal., for appellees.

Before TANG, SKOPIL and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

In this consolidated appeal, Frederick S. Wyle, the trustee for United Energy Corporation ("UEC") and Renewable Power Corporation ("RPC") ("Trustee"), appeals the decision of the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") that reversed certain judgments of the Bankruptcy Court for the Northern District of California. Appellees ("investors") were unwitting investors in a Ponzi scheme [1] in which they bought solar energy production modules from UEC and signed contracts to sell the power produced by the modules to RPC, a related corporation. To attract new investors, existing investors were paid for power their modules never produced ("power payments") on the basis of false invoices generated by UEC and RPC. After the scheme was uncovered, UEC filed for Chapter 11 reorganization and RPC was involuntarily brought into the bankruptcy proceedings on petition by the UEC Trustee.

---

1. A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any "profits" of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment. *See Cunningham v. Brown,* 265 U.S. 1, 7–8, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924); *Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.),* 916 F.2d 528, 531 (9th Cir.1990).

The Trustee sought to avoid the power payments to the investors. He argued that the investors did not give reasonably equivalent value for the payments, and hence the payments should be set aside as fraudulent transfers of the debtor's property. The bankruptcy court agreed. The BAP reversed. It held that the investors acquired rescission claims at the time they bought their solar modules. These rescission claims gave the investors rights of restitution, and these rights could be exchanged for the power payments. Thus, the BAP reasoned, the investors gave equivalent value for the power payments they received, and these payments were not fraudulent transfers.

The BAP also held that the investors' contracts to buy the modules and their contracts to sell the power were indivisible. Therefore, the investors' rights to rescind the contracts to buy the modules from UEC could be exchanged on a dollar-for-dollar basis for payments received under the investors' contracts with RPC to sell power produced by the modules. *C.H. Rider & Family v. Wyle (In re United Energy Corp.)*, 102 B.R. 757 (9th Cir. BAP 1989).

We have jurisdiction pursuant to 28 U.S.C. § 158(d) and we affirm the BAP decision.

## FACTS AND PROCEDURAL HISTORY

In 1982, UEC began manufacturing and marketing solar modules to the public. A prominent feature of the sales campaign was the representation that federal and state tax benefits could be obtained by participating in solar energy production. *See In re United Energy Corp.*, 102 B.R. at 758–59. These purported benefits, however, either never materialized or proved to be grossly exaggerated. *See id.* at 759 n. 2.

The modules were designed to convert sunlight into electricity and thermal energy. From 1982 through 1985, UEC sold 5,323 of these modules to 4,500 purchasers for $30,000 to $40,000 each. The purchase contracts for the modules usually provided for down payments ranging from 36% to 43% of the purchase price, with the remainder financed by long-term, generally nonrecourse, promissory notes which were payable in semiannual or annual installments and secured by the modules themselves. On gross module sales of over $200 million, UEC collected approximately $83.5 million in cash—$66.7 million from down payments and $16.8 million from installment payments on the promissory notes.

At the time of sale, each module purchaser was also offered a contract, called a "Power Purchase Agreement," to sell the electric and thermal power generated by the modules to RPC. The same individual, Delphine Lampert, was the sole shareholder in both UEC and RPC. UEC and all its affiliated companies were operated by Delphine Lampert's husband, Ernest Lampert.

The modules were to be placed on three California solar energy farms to be operated by RPC. The Power Purchase Agreements obligated RPC to buy all power generated from the modules. The UEC promotional literature stated that the electricity bought by RPC would be resold to utilities and the thermal energy would be used to support various business activities of RPC at the solar farms. The Power Purchase Agreements did not guarantee any minimum return or profit level.

The UEC solar farms produced a negligible amount of power.[2] Nevertheless, in order to attract additional purchasers, UEC and RPC, in typical Ponzi scheme fashion, made it appear that the business venture was a rousing success. UEC and RPC fabricated fictitious kilowatt hours of production for each module. RPC then paid module owners for this phony production. These are the power payments the Trustee sought to set aside as fraudulent transfers. They totaled $4,754,936.

The power payments were made quarterly, from the first quarter of 1983 through

---

**2.** By the time the Trustee discontinued operation of the solar farms, the modules had produced, in the aggregate, only approximately $3,400 of electric power for sale to utilities. No thermal energy was ever sold to an outside purchaser, and only a negligible amount of thermal energy was used by RPC for its on-site needs.

the third quarter of 1984, and were accompanied by realistic-looking utility statements that ostensibly detailed meter readings from each module. Because RPC had no income or assets of its own from which to make the power payments, it obtained the cash to make the payments from funds lent to it by UEC through a third entity, United Financial Corporation ("UFC"). UFC was owned and operated by the same individuals who controlled UEC and RPC.

The illusion of credibility surrounding the solar energy production operation was shattered in late 1984 when the California Department of Corporations filed suit against UEC in state court for the illegal sale of securities. All power payments were discontinued after the third quarter of 1984.

## A. Bankruptcy Court Proceedings

### 1. *Wyle v. C.H. Rider & Family*

C.H. Rider & Family, C.H. Rider and Thomas A. Rider (collectively, "Rider") bought ten modules from UEC and invested $159,127 in the form of a down payment and installment payments on a promissory note. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, Ch. 11 Case No. 3-8500636-LK, Adv. No. 3-86-0409-LK, Findings of Fact and Conclusions of Law at 8-9 (Bankr.N.D.Cal. July 20, 1987). They received $23,980.40 in fictitious power payments. *Id.* at 9-10. The Trustee sought to avoid these power payments as a fraudulent transfer. After a trial in which Rider stipulated to the insolvency of UEC and RPC, the bankruptcy court found that the power payments to Rider were not made in exchange for reasonably equivalent value and, therefore, were avoidable by the Trustee as fraudulent transfers. *See id.* at 10-12, 14-15. Specifically, the bankruptcy court found that "[n]o property was received by UEC or RPC in exchange for the power payments ... [and n]o ante-

cedent debt of either UEC or RPC to Rider was satisfied or secured, in whole or in part, in exchange for the power payments." *Id.* at 10. From this finding, the bankruptcy court concluded as a matter of law that "[n]either UEC nor RPC received a reasonably equivalent value, or any value, in property or satisfaction of a present or antecedent debt, in exchange for the power payments paid to the module purchasers." *Id.* at 14. The bankruptcy court further reasoned that Rider's claims for fraud were general unsecured claims which could not be offset against the fraudulent conveyances. *Id.*

### 2. *ABCD Enterprises* and Related Cases

The Trustee also filed an adversary proceeding against several hundred other module purchasers who, as a group, had received approximately $200,000 of fictitious power payments. *Wyle v. ABCD Enterprises (In re United Energy Corp.)*, Ch. 11 Case No. 3-85-00636-LK, Adv. No. 3-86-0408-LK, Findings of Fact and Conclusions of Law on Motions for Partial Summary Judgment at 10 (Bankr.N.D.Cal. Oct. 13, 1987). Additional adversary proceedings were filed against Martin and Barbara Altbaum, Land and Solar Partners, Plaza Investors V and Cris C. Cris, and Jeanne Bauer. These investors were sued separately because of the size of the claims against them.[3] In each of these adversary proceedings, partial summary judgment was granted to the Trustee allowing him to recover the power payments as fraudulent transfers. *See, e.g., id.* at 12-16. Findings of fact and conclusions of law similar to those in *Rider* were entered. *See, e.g., id.* at 3-16.

## B. The BAP Decision

The BAP consolidated the cases and reversed the bankruptcy court. *In re United*

---

**3.** Martin and Barbara Altbaum invested $155,-538.56 in UEC and received $20,200.24 in the ficticious power payments. Land and Solar Partners received $11,291.50 in ficticious power payments. Plaza Investors V and its general partner Cris C. Cris invested $97,341.58 and received $3962.03 in power payments.

Hereinafter all references to *ABCD Enterprises* will include those individual investors who were sued separately unless specifically excluded.

*Energy Corp.*, 102 B.R. 757 (9th Cir.BAP 1989). The BAP held that

> [t]he holdings of *[Merrill v. Abbott (In re] Independent Clearing House[ ),* 41 B.R. 985 (Bankr.D.Utah 1984), *aff'd in part, rev'd in part,* 77 B.R. 843 (D.Utah 1987) ] and *Eby [v. Ashley,* 1 F.2d 971 (4th Cir.1924) ] point to the result in this case. In a suit for damages, the power payments given to the defrauded investors would be deemed to partially satisfy or release fraud or restitution claims. *See [In re Independent Clearing House,* 77 B.R.] at 857 n. 2 (citing Restatement of Restitution § 1 (1936); Restatement (Second) of Contracts §§ 164 & 376 (1979)) (in the absence of a valid contract, investors prior to repayment would have a claim for restitution to prevent unjust enrichment; if the investment agreement was valid, but investors were fraudulently induced to enter into the contract, rights to restitution still would arise). Satisfaction of such claims would constitute value given for the receipt of the power payments within the meaning of section 548(d)(2)(A) or the comparable California provision.
>
> As an alternative basis for finding that value was given, we view the two agreements with investors as indivisible. In entering into such a transaction, the obvious intent of the parties was not confined to purchase or sale of the modules. [The investors] were led to believe and expected that their down payments and note payments would be covered by the power payments, which would not only liquidate their non-recourse obligations for the modules, but also ultimately provide them with a profit.

*Id.* at 763. The Trustee timely appealed the BAP decision in these consolidated cases to this court.

## STANDARD OF REVIEW

"This court is in as good a position as the BAP to review the findings of the bankruptcy court." *Tsafaroff v. Taylor (In re Taylor),* 884 F.2d 478, 480 (9th Cir.1989) (citing *Harsh Inv. Corp. v. Bialac (In re Bialac),* 712 F.2d 426, 429 (9th Cir.1983));

see also *Romley v. Sun Nat'l Bank (In re Two "S" Corp.),* 875 F.2d 240, 242 (9th Cir.1989). The bankruptcy court's conclusions of law are reviewed de novo and its findings of fact under the clearly erroneous standard. *In re Taylor,* 884 F.2d at 480; *Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989). The bankruptcy court's grant of summary judgment is reviewed de novo. *See Nash v. Kester (In re Nash),* 765 F.2d 1410, 1412 (9th Cir. 1985). This court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

## DISCUSSION

A bankruptcy trustee has the power to avoid fraudulent transfers pursuant to state law and/or the provisions of the Bankruptcy Code ("Code"). *See* 11 U.S.C. §§ 544(b), 548. "Section 544(b) of the ... Code allows the trustee to avoid any transfers of a debtor's property ... which would be avoidable under state law, and section 548 provides a federal statutory basis for avoiding fraudulent transfers." *In re United Energy Corp.,* 102 B.R. at 760 (footnote omitted). Here, the Trustee attempted to avoid the transfers to the investors under both section 544(b) and section 548(a)(2) of the Code.

Section 544(b) provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim...." 11 U.S.C. § 544(b). The applicable law in this instance is California law. The applicable sections of California's fraudulent conveyance law provide that, as regards both present and future creditors:

> [a] transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer...:
>
> ....

(b) Without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor:

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they become due.

Cal.Civ.Code § 3439.04 (West Supp.1991).

With respect to present creditors, California law provides:

[a] transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer ... without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer....

Cal.Civ.Code § 3439.05 (West Supp.1991).

Section 548(a)(2) of the Code provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before date of the filing of the petition, if the debtor ...—

....

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and

(B)(i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer ...;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(2).[4]

California's fraudulent conveyance statutes are similar in form and substance to the Code's fraudulent transfer provisions. Both allow a transfer to be avoided where "the debtor did not receive a 'reasonably equivalent value' in exchange for the transfer and [the debtor] was either insolvent at the time of the transfer or was engaged in business with unreasonably small capital." *In re United Energy Corp.*, 102 B.R. at 760. Therefore, we analyze the state statutes and the Code provisions contemporaneously.[5]

■ For a trustee in bankruptcy to avoid a transfer as fraudulent under section 548(a)(2), four elements must be satisfied: (1) the transfer must have involved property of the debtor; (2) the transfer must have been made within one year of the filing of the petition; (3) the debtor must not have received reasonably equivalent value in exchange for the property transferred; and (4) the debtor must have been insolvent, been made insolvent by the transaction, be operating or about to operate without property constituting reasonable sufficient capital, or be unable to pay debts as they become due. 11 U.S.C. § 548(a)(2). The parties do not dispute that the power payments were property of either UEC or RPC. The one-year transfer period is not in issue, and the insolvency of UEC and RPC is not disputed. Thus, the only issue for our determination, in connection with

---

**4.** The Trustee in this matter did not seek to recover the power payments pursuant to Code section 548(a)(1). Under section 548(a)(1), a trustee in bankruptcy may recover transfers made by the debtor if the debtor "made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted...." Because section 548(a)(1) is not in issue in this case, *Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d

528 (9th Cir.1990), is not applicable. *See id.* at 538 (distinguishing *In re United Energy Corp.* on this basis).

**5.** One difference between the California statutes and the Code provisions is that while the Code only allows a trustee to avoid fraudulent transfers made within one year before the filing of a petition in bankruptcy, California fraudulent conveyance law does not have this temporal limitation.

the fraudulent transfer question, is whether the investors gave reasonably equivalent value in exchange for the power payments they received.

Value is defined for purposes of section 548 of the Code as "property, or satisfaction or securing of a present or *antecedent debt* of the debtor...." 11 U.S.C. § 548(d)(2)(A) (emphasis added). The term "antecedent debt" is not defined in the Code. "Debt," however, is defined in the general definition section of the Code as "liability on a claim." 11 U.S.C. § 101(12). "Claim" is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured....

11 U.S.C. § 101(5).

■ The legislative history of the Code evidences Congress' desire to provide an expansive definition of "claim" under section 101(4). *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6266; S.Rep. No. 989, 95th Cong. 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5807–08; *see also Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *Ohio v. Kovacs*, 469 U.S. 274, 279–80, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1218 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). The term "debt" should be read as being coextensive with the term

"claim", *Davenport*, 110 S.Ct. at 2130. Thus, it is plain that Congress intended "debt" and, therefore, "antecedent debt," to be construed broadly. *See id.; see also* H.R.Rep. No. 595, 95th Cong. 1st Sess. 310, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6267; S.Rep. No. 989, 95th Cong., 2d Sess. 23, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5809.

■ Given this expansive interpretation, we conclude the BAP properly reversed the bankruptcy courts on the basis that the investors exchanged reasonably equivalent value when their rights to restitution were proportionately reduced by the power payments they received.[6] *See Eby v. Ashley*, 1 F.2d 971, 972–73 (4th Cir.1924), *cert. denied*, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925); *Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.)*, 88 B.R. 792, 796 (Bankr.N.D.Ohio 1988); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 856–59 (D.Utah 1987); *cf. Davenport*, 110 S.Ct. at 2134 (criminal restitution obligations constitute "debts" within the definition of "debt" in Code section 101(12)).

The Trustee contends that this line of cases is distinguishable because, in each instance, the original investment instrument between the parties provided that the investor would recover the original principal amount paid. He argues that the module sales agreements were simply that—sales contracts and not investment devices involving a contractual right to the return of principal.

■ This argument fails to consider the Code's broad definition of the term "debt." The Code does not require that a "debt" be a contractual liability. Instead, "debt" is defined as a liability on a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

---

6. We must point out that this case does not involve investors who received more from the debtor than the amounts of their respective total investments. Such excess amounts would be avoidable because the debtor would not have received reasonably equivalent value for them.

*See Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir.1924), *cert. denied*, 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925) (amounts paid in excess of principal amounts deemed fraudulent); *Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.)*, 88 B.R. 792 (Bankr.N.D.Ohio 1988) (same).

unsecured...." 11 U.S.C. § 101(5)(A). In the present case, the investors were duped into buying the solar modules. They clearly had claims for rescission and restitution which arose when they bought the modules, regardless of whether there existed a contractual right to the return of principal. *See In re Independent Clearing House Co.*, 77 B.R. at 857.[7] These claims fit within the Code's broad definition of "debt."

The Trustee contends that even if the investors' right to restitution could be considered a "debt," the power payments were not transferred in exchange for such a debt. On one level, the Trustee is, of course, correct. The investors signed two separate contracts—one with UEC for the purchase of the modules and another with RPC for the sale of power produced by the modules. UEC and RPC were separate entities. On this basis the Trustee argues RPC received nothing in exchange for the power payments it made, and therefore the Trustee should have been allowed to avoid these payments as fraudulent transfers. We reject this argument.

■ Bankruptcy courts are courts of equity. As such, they possess the power to delve behind the form of transactions and relationships to determine the substance.

*See Global W. Dev. Corp. v. Northern Orange County Credit Serv., Inc. (In re Global W. Dev. Corp.)*, 759 F.2d 724, 727 (9th Cir.1985); *Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 436 (6th Cir.1982); *ITT–Industrial Credit Co. v. Hughes*, 594 F.2d 384, 386 (4th Cir.1979). We agree with the BAP that the two contracts, the module purchase agreement and the power sale agreement, are intimately intertwined.[8] As the BAP concluded,

> the obvious intent of the parties was not confined to purchase or sale of the modules. [The investors] were led to believe and expected that their down payments and note payments would be covered by the power payments, which would not only liquidate their non-recourse obligations for the modules, but also ultimately provide them with a profit.

*In re United Energy Corp.*, 102 B.R. at 763.

■ We recognize that if the power payments are not set aside, earlier investors who received these payments will enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky. To the extent these payments were made more than a year prior to bankruptcy, of

7. In recognizing these claims for rescission and restitution, we assume that the investors had no knowledge of the fraud the debtors were perpetrating. If investments were made with culpable knowledge, all subsequent payments made to such investors within one year of the debtors' bankruptcy would be avoidable under section 548(a)(2), regardless of the amount invested, because the debtors would not have exchanged a reasonably equivalent value for the payments. *Cf. In re Independent Clearing House Co.*, 77 B.R. at 857–58.

Similarly, if there is a question about a recipient's innocence at the time he received a payment under a Ponzi scheme, avoidance of the transfer might be sought under section 548(a)(1). *See id.* at 859–61; *cf. Eby.* 1 F.2d at 973 (where investor received money back in good faith, equity would not require him to return it). Doing so would bring into play section 548(c), thereby requiring the courts to consider the good faith of an investor who wished to retain payments, or portions of payments, received from the debtor. *See In re Independent Clearing House Co.*, 77 B.R. at 861–62.

8. This interpretation of the substance of the transaction is buttressed by the fact that state courts, bankruptcy courts, the BAP, the Trustee and the investors all agree that the overall scheme perpetuated by UEC and RPC constituted an investment contract. An "investment contract" is a "contract, transaction or scheme whereby a person invests his [or her] money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). Thus, an "investment contract" can consist, as it does here, of two or more contracts which together constitute an "investment" or "scheme." As the BAP concluded, "[t]he separate entities created by the Lamperts were components of a single fraudulent scheme. The agreement for the purchase of the modules and the agreement for the sale of power were thus parts of an indivisible investment contract [and t]he debtors received reasonably equivalent value in exchange for the Ponzi payments, which were made to the defrauded ... investors, within the meaning of section 548(a)(2)." *In re United Energy Corp.*, 102 B.R. at 764.

course, there is no authority under section 548 to avoid the payments. As to payments made a year or less prior to bankruptcy, section 548(a)(2) directs the courts to determine whether the debtor received reasonably equivalent value in making the payments. In making this determination, the analysis is " 'directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost' ". *Martin v. Phillips (In re Butcher)*, 58 B.R. 128, 130 (Bankr.E.D.Tenn.1986) (quoting *Meister v. Jamison (In re Jamison)*, 21 B.R. 380, 382 (Bankr.D.Conn.1982), *later proceedings*, 829 F.2d 596 (6th Cir.1987), *cert. denied*, 484 U.S. 1078, 108 S.Ct. 1058, 98 L.Ed.2d 1020 (1988)) (emphasis added). This is so because the policy behind section 548 is to preserve the assets of the estate. *Id.* This policy differs from that which undergirds the law of preferences. The aim of preference law under the Bankruptcy Code is to guard all parties by promoting equal distribution of the debtor's estate. *See In re Bullion Reserve*, 836 F.2d at 1217. Because we are not presented with a preference question under section 547, the discussions of preferences in *In re Bullion Reserve*, 836 F.2d at 1219, and *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 217 (9th Cir.1987), are not on point. *Bullion Reserve* and *Bishop* both involved efforts by the Trustee to recover payments to investors in Ponzi schemes as preferential transfers under Code section 547(b).

■ Finally, the Trustee argues that by allowing the investors to retain the power payments we are, in effect, sanctioning an impermissible offset of a fraudulent conveyance against general unsecured claims. This assertion, however, is a bit misleading as it places the proverbial cart before the horse by assuming the conclusion. It is true that a fraudulent conveyance cannot be offset against or exchanged for a general unsecured claim. *See Mack v. Newton*, 737 F.2d 1343, 1366 (5th Cir.1984); *Hassett v. Weissman (In re O.P.M. Leasing Servs., Inc.)*, 35 B.R. 854, 868 (Bankr. S.D.N.Y.1983), *aff'd in part, rev'd in part,*

48 B.R. 824 (S.D.N.Y.1985). However, it must first be ascertained that a transfer is a fraudulent conveyance. Because we conclude that there was no fraudulent transfer here, we must necessarily conclude that there was no impermissible offset.

The decision of the BAP is AFFIRMED.