**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   ID-11-1081-MkDJu |
| ) | |
| RAYMOND KEITH PRINGLE, ) | Bk. No.   09-41653 |
| ) | |
|                Debtor. ) | Adv. No.  10-08023 |
| _____ ) | |
| ) | |
| JOLENE HASSE, ) | |
| ) | |
|                Appellant, ) | |
| ) | |
| v. ) | **O P I N I O N** |
| ) | |
| GARY L. RAINSDON, Chapter 7 ) | |
| Trustee, ) | |
| ) | |
|                Appellee. ) | |
| _____ ) | |

Argued by Video Conference on November 17, 2011
Submitted on January 7, 2013

Filed – July 2, 2013

Appeal from the United States Bankruptcy Court
for the District of Idaho

Honorable Jim D. Pappas, Bankruptcy Judge, Presiding

_____

Appearances:     Clayne Zollinger, Jr., for appellant Jolene Hasse;
                 Daniel C. Green, of Racine, Olson, Nye, Budge &
                 Bailey, Chartered, for appellee Gary L. Rainsdon.

_____

Before:  MARKELL, DUNN and JURY, Bankruptcy Judges.

MARKELL, Bankruptcy Judge:

Before the debtor, Raymond Pringle, filed his chapter 7[1] bankruptcy, he transferred his house to Jolene Hasse. The bankruptcy court found this transaction to be avoidable as a fraudulent transfer under 11 U.S.C. § 548. Hasse appeals. After finding that the bankruptcy court and this Panel have authority to decide the matters involved in this appeal, we AFFIRM.

## I. FACTS

**A. Prepetition Actions**

Hasse and Pringle had a long-term relationship as boyfriend and girlfriend. They lived together in Pringle's house (the "Residence") for at least eight years.

In April 2008, about a year and a half before he filed bankruptcy, Pringle transferred the Residence to Hasse. Pringle used a form of gift deed to effectuate the transfer; on its face, it recites that the transfer was being made "For Love and Affection." Compl. (Feb. 23, 2010) at ¶ 1 and Ex. A; Answer (Mar. 26, 2010) at ¶ 1.

At the time of the April 2008 transfer, the Residence was not encumbered and was worth at least $35,000. Also at that time, Pringle had less than $5,000 in nonexempt assets. His liabilities were roughly $24,000 and were mostly in the nature of credit card debt.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure .

**B.    Pringle Files Bankruptcy**

Pringle filed his chapter 7 bankruptcy case in October 2009. Appellee Gary Rainsdon (the "Trustee") was appointed to serve as Pringle's trustee. In Pringle's statement of financial affairs, he disclosed the transfer of the Residence to Hasse, and described the transfer as a gift, with no value received in exchange.

The meeting of creditors pursuant to § 341(a) was held in December 2009. At that time, the Trustee asked Pringle about the transfer of his Residence, and Pringle testified that at the time of the transfer he had a legal matter that was coming up and he figured it would be better if the Residence was not in his name. According to Pringle, he was being sued by a man named Jose Luna for roughly $100,000 on account of an automobile accident, and Pringle was concerned that Luna ultimately might try to take away his Residence. By the time of his bankruptcy filing, however, Pringle did not list Luna as a creditor, and no one named Luna filed a proof of claim.

**C.    The Trustee Files the Fraudulent Transfer Action**

Based on this information, in February 2010 the Trustee filed a complaint against Hasse seeking to avoid Pringle's transfer of the Residence as a fraudulent transfer under § 548[2]

---

[2]The complaint stated a claim for relief alleging a "constructive" fraudulent transfer under § 548(a)(1)(B); that is, an avoidable fraudulent transfer in which the mental state of the transferor is irrelevant. There were no allegations in the complaint that Pringle transferred the Residence with the intent to hinder, delay, or defraud his creditors, as required for avoidance of a transfer under § 548(a)(1)(A). At trial, however,
(continued...)

3

and state law.[3]

The Trustee's complaint alleged that the bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H). In her answer, Hasse admitted the Trustee's jurisdictional allegations. Both parties' pleadings thus agreed that the matter was a core proceeding under 28 U.S.C. § 157(b)(2)(H). As a likely consequence of this understanding, neither party included in their respective pleadings a statement as to whether they consented to the bankruptcy court's entry of final judgment. See Rules 7008(a) and 7012(b).

After Hasse answered the Trustee's complaint, the parties engaged in discovery. In response to the Trustee's

---

[2](...continued)
the bankruptcy court expressly found that Pringle had the requisite actual intent for liability under § 548(a)(1)(A). Hasse challenges the finding of actual intent itself, but not the predicate issue of whether the § 548(a)(1)(A) claim was properly before the bankruptcy court. Accordingly, we decline to address that predicate issue. See Golden v. Chicago Title Ins. Co. (In re Choo), 273 B.R. 608, 613 (9th Cir. BAP 2002); see also Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.), 252 F.3d 1039, 1045 n.3 (9th Cir. 2001) (declining to consider ramifications of new argument, and deeming argument waived, when argument was raised for the first time on appeal). Essentially, however, the bankruptcy court sua sponte amended the complaint to conform to the evidence of actual intent introduced at trial — an action which neither party objected to. See Civil Rule 15(b)(2) (incorporated by Rule 7015). The "amended" complaint thus pleads claims for relief under §§ 548(a)(1)(A) and (a)(1)(B).

[3]There is no indication in the record that the bankruptcy court ever disposed of the Trustee's second cause of action seeking to avoid the transfer of the Residence under Idaho fraudulent transfer law. Nonetheless, we may treat Hasse's notice of appeal as a motion for leave to appeal, and we hereby grant that leave. See Rule 8003(c); Magno v. Rigsby (In re Magno), 216 B.R. 34, 38 (9th Cir. BAP 1997).

4

interrogatories, Hasse gave a different account of the reason why Pringle transferred the Residence to her:

> The transfer of the property was pursuant to a verbal agreement between the Defendant and the Debtor. The Defendant, Jolene Hasse, agreed to allow Mr. Pringle to stay in the home for the rest of his life. The Defendant assumed the responsibility for paying for the taxes, the utilities, and all the upkeep on the home. She also agreed to take care of Mr. Pringle for the rest of his life. Mr. Pringle suffers from diabetes and has limited vision and needs someone to help him and especially drive him as he is unable to drive at night.

See Trustee's Pretrial Memorandum (Dec. 2, 2010) at p. 2 (quoting Hasse's response to the Trustee's Interrogatory No. 8).[4]

**D.    The Nonjury Trial and the Bankruptcy Court's Entry of a Final Judgment**

The bankruptcy court tried the case in December 2010. Pringle was the only witness the Trustee called. Pringle acknowledged his prior testimony at the December 2009 meeting of creditors, but at the same time maintained that he gave Hasse the residence in exchange for Hasse's oral agreement to continue to take care of him and to let him continue to live there.

At the close of evidence, Hasse conceded that Pringle's transfer of the Residence rendered Pringle insolvent. Regardless, Hasse maintained that the transfer could not be

---

[4]Even though neither of the parties provided us with copies of their pre- and post-trial briefs, we have obtained copies by accessing the bankruptcy court's online adversary proceeding docket and the imaged documents attached thereto. We can take judicial notice of the filing and contents of these documents. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

5

avoided because she had given reasonably equivalent value in exchange for the transfer.

Hasse also argued that § 548 should not apply at all because the transfer could not have harmed Pringle's creditors. If Pringle had not transferred the Residence to her, Hasse reasoned, it would have been exempt. He thus could have precluded his creditors from ever realizing the Residence's value, a sort of "no harm, no foul" argument.

Both sides filed post-trial briefs, and in January 2011, the bankruptcy court reconvened the matter and orally stated its findings of fact and conclusions of law on the record. The court apparently credited, at least in part, Hasse's contention and Pringle's testimony that Hasse made certain promises in exchange for the transfer of the Residence:

> [Pringle], at some point in time, prior to April of 2008, . . . reached an oral agreement with the defendant that he would deed his home located, I believed it's in Albion, Idaho, to her, in consideration of her promise to maintain the home, pay the taxes on the home, and to allow him to live in the home for the rest of his life with her and in exchange and consideration of her agreement to provide care and comfort to him and particular with respect to caring for him as a result of his medical condition.

Hr'g Tr. (Jan. 4, 2011) at 4:20-5:3. However, the court also held that value for purposes of § 548 must result in economic benefit to creditors. He then found that "whatever value, real value came out of [Hasse's] promise was not reasonably equivalent to the value that the debtor gave up in this exchange and that was a $35,000 unencumbered house." Hr'g Tr. (Jan. 4, 2011) at 7:21-8:2.

In addition, the court rejected Hasse's "no harm, no foul"

6

argument. The court held that <u>Fox v. Smoker (In re Noblit)</u>, 72 F.3d 757 (9th Cir. 1995) and <u>Trujillo v. Grimmett (In re Trujillo)</u>, 215 B.R. 200 (9th Cir. BAP 1997) <u>aff'd</u>, 166 F.3d 1218 (9th Cir. 1999) (table) had rejected the argument, and that he was bound to follow both. In expanding on the argument, the court noted that Hasse's argument hinged on a false premise: that Pringle still was entitled to an exemption in the Residence after he voluntarily transferred the Residence to Hasse. As the court stated:

> Congress has, I think, made it pretty clear that if debtors want the benefit of an exemption they should not transfer the property away to another before filing for bankruptcy. If they do so and the transfer's avoided, then under Section 522(g) the exemption can't be claimed and if I were to honor the no harm, no foul doctrine in a -- in a case like this, effectively I'd be allowing a debtor [to] escape the consequence of that.

Hr'g Tr. (Jan. 4, 2011) at 9:18-25.

As an alternate basis for ruling in favor of the Trustee, the court found that Pringle had made the transfer with the intent to hinder and delay Luna, who was suing Pringle at the time the transfer was made.

The court entered judgment in favor of the Trustee avoiding Pringle's transfer of the Residence to Hasse. Hasse timely appealed.

## II. CONSTITUTIONAL AUTHORITY

Under <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011), we have an independent duty to consider whether the bankruptcy court had the constitutional authority to determine the fraudulent transfer claim. This issue is reviewed de novo. <u>Cf.</u> <u>Rosson v. Fitzgerald (In re Rosson)</u>, 545 F.3d 764, 769 n.5 (9th Cir. 2008); <u>Cal.</u>

7

Franchise Tax Bd. v. Wilshire Courtyard (In re Wilshire Courtyard), 459 B.R. 416, 423 (9th Cir. BAP 2011).

This is not, however, an inquiry into subject matter jurisdiction, as the Ninth Circuit recently confirmed. "Stern . . . made clear that § 157 'does not implicate questions of subject matter jurisdiction.'" Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.), 702 F.3d 553, 567 (9th Cir. 2012) (quoting Stern, 131 S. Ct. at 2607), cert. granted, 2013 WL 3155257 (U.S. June 24, 2013) (No. 12-1200). Rather, what is implicated is whether "[s]ection 157 [constitutionally] allocates the authority to enter final judgment[s] between the bankruptcy court and the district court." Stern, 131 S. Ct. at 2607 (emphasis supplied).

Here, it is beyond doubt that an Article III district court would have had subject matter jurisdiction under 28 U.S.C. § 1334(b), as a proceeding under § 548 "arises under" the Code. What is at issue here is whether the referral authorized under both 28 U.S.C. § 157(a) and the District of Idaho's general order of reference, Third Amended General Order No. 38 (D. Idaho, April 24, 1995), was constitutionally valid as applied in this case.[5]

**A.   Bellingham**

In December 2012, the Ninth Circuit decided Bellingham. That case holds that, despite Congress's designation of

---

[5]At oral argument in November 2011, the Panel raised the effect of Stern, and offered the parties the opportunity to brief the issue, as Bellingham was then under consideration by the Ninth Circuit. Both sides submitted briefs. After Bellingham was decided, the Panel offered the parties the opportunity to brief Bellingham's effect on this appeal. Both sides again submitted briefs.

8

fraudulent conveyance actions as core matters,[6] bankruptcy courts do not have authority to unilaterally hear and determine them. 702 F.3d at 565-66. But more importantly to this appeal, the Ninth Circuit also held that, notwithstanding this lack of unilateral authority, a bankruptcy court could still hear and determine – and enter a final judgment – in such a proceeding with the parties' consent. 702 F.3d at 567.[7] It further held that such consent need not be express, but could be implied. Id.

Bellingham's basic arguments are simple. The congressional allocation of authority in 28 U.S.C. § 157 recognizes that, especially in matters "related to" a bankruptcy case, a non-Article III judge may not unilaterally enter a final judgment. That was the learning of Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982). 702 F.3d at 566-67.

But Congress anticipated that concentrating decisionmaking in one court for bankruptcy matters was desirable. As noted by a leading treatise, the broad scope of section 1334(b) of title 28

---

[6]Section 157(b)(2)(H) designates proceedings to recover "fraudulent conveyances" as core matters. This reference undoubtedly includes section 548 fraudulent transfers. As was noted when the Uniform Fraudulent Transfer Act was promulgated in 1984:
> The Committee determined to rename the Act the Uniform Fraudulent Transfer Act in recognition of its applicability to transfers of personal property as well as real property . . . ."

Prefatory Note, Uniform Fraudulent Transfer Act (1984), 7A, pt. II, U.L.A. 5 (2006).

[7]The Sixth Circuit has adopted a contrary rule. Waldman v. Stone, 698 F.3d 910 (6th Cir. 2012). The Supreme Court has granted certiorari in Bellingham and presumably will resolve the split between the circuits.

"evidences the intent of Congress to bring all bankruptcy-related litigation within the purview of the district court, at least as an initial matter, irrespective of congressional statements to the contrary in the context of other specialized litigation." 1 COLLIER ON BANKRUPTCY ¶ 3.01[3] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013).

In this spirit, Congress also drafted the applicable bankruptcy jurisdictional statutes to allow bankruptcy courts to hear – but not determine – matters that they may not constitutionally decide. 28 U.S.C. § 157(c)(1). But Congress went further: it allowed the bankruptcy court to determine those disputes – that is, enter a final decision, subject only to appellate and not de novo review – "with the consent of all the parties to the proceeding." Id. § 157(c)(2). See Mann v. Alexander Dawson, Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990). Congress thus determined that parties could consent to a non-Article III judge hearing and entering a final judgment in matters in which that non-Article III judge could not unilaterally act.

From this, Bellingham reasoned that "[i]f consent permits a non-Article III judge to [finally] decide [] a non-core proceeding, then it surely permits the same judge to decide a core proceeding in which he would, absent consent, be disentitled to enter final judgment. The only question, then, is whether [the party objecting to the bankruptcy court's authority] did in fact consent to the bankruptcy court's jurisdiction [i.e.,

10

authority]."  702 F.3d at 567 (emphasis supplied).[8]

**B.    Sufficiency of Implied Consent**

Although <u>Bellingham</u> required consent, consent does not have a unitary meaning.  <u>See generally</u> Daniel J. Bussel & Kenneth N. Klee, <u>Recalibrating Consent in Bankruptcy</u>, 83 Am. Bankr. L.J. 663 (2009).  Does it include "implied" consent, or must the consent be express?  And do there have to be procedural safeguards to ensure that it is informed?

<u>Bellingham</u> made short work of the first question; it rejected the argument that consent must be express.  This rejection was based on two statutory arguments; one related to the manner in which 28 U.S.C. § 157 deals with jury trials, and one related to analogies to the Federal Magistrates Act.

---

[8]Although the Ninth Circuit referred to the lack of "jurisdiction," we understand that reference to be to the bankruptcy court's ability under the Constitution to "determine" a matter as contemplated by 28 U.S.C. § 157(b)(1): "[B]ankruptcy judges may hear and <u>determine</u> all cases under title 11 and all core proceedings arising under title 11[.]"  <u>Id.</u> (emphasis supplied).

Unfortunately, the imprecise use of "jurisdiction" is not uncommon.  As the Supreme Court has noted, "Courts, including this Court, it is true, have been less than meticulous in this regard; they have more than occasionally used the term 'jurisdictional' to describe emphatic time prescriptions in rules of court.  'Jurisdiction,' the Court has aptly observed, 'is a word of many, too many, meanings.'"  <u>Kontrick v. Ryan</u>, 540 U.S. 443, 454 (2004) (quoting <u>Steel Co. v. Citizens for Better Env't</u>, 523 U.S. 83, 90 (1998)).  The "time prescriptions" reference is obviously irrelevant here, but the overall observation is relevant.

As a result, although <u>Bellingham</u> uses "jurisdiction" to refer to the authority to determine a core proceeding, we refer directly to the bankruptcy court's "authority" to avoid any possible confusion stemming from the use of the word "jurisdiction."

11

### 1. Jury Trial Analogy

With respect to jury trials, Bellingham looked to 28 U.S.C. § 157(e), which permits bankruptcy judges to conduct jury trials only with "express" consent. The court found meaning in the inclusion of the adjective "express," finding that the omission of that adjective in 28 U.S.C. § 157(c)(2) was purposeful. Bellingham, 702 F.3d at 569. Accordingly, Bellingham stated that "in cases like this one — in which the defendant was aware of its right to seek withdrawal of the reference but opted instead to litigate before the bankruptcy court — consent is established." Id.

### 2. Magistrate Analogy

The Ninth Circuit next analogized the bankruptcy consent statute to the consent provision in the Federal Magistrates Act, 28 U.S.C. § 636(c)(1).[9] Bellingham, 702 F.3d at 569. The Magistrate Act provides that a magistrate judge may order final judgment "[u]pon the consent of the parties." 28 U.S.C.

---

[9]This method of inquiry mirrors congressional thought at the time of 28 U.S.C. § 157's enactment. This is reflected in the remarks of Rep. Kindness, co-author of the amendment that became 28 U.S.C. § 157(c). 130 Cong. Rec. 6242-43 (1984) ("In Marathon-type suits, the bankruptcy judge will exercise the same powers as the magistrate."). See also 1 COLLIER ON BANKRUPTCY, supra, at ¶ 3.03[2]:

> Section 157(c)(1) is drawn from 28 U.S.C. § 636(b)(1), which is part of the United States Magistrate Judges Act and that contains analogous provisions for proposed findings and recommendations to be made by magistrate judges and submitted to district judges. The powers accorded magistrate judges under section 636(b)(1) have passed constitutional muster, and the teachings of the case upholding that section apply directly to the treatment contained in section 157(c)(1).

§ 636(c)(1). The Supreme Court has held that this language permits implied consent when the allegedly consenting party has "be[en] notified of [its] right to refuse and after being told that [the Magistrate Judge] intended to exercise case-dispositive authority." Roell v. Withrow, 538 U.S. 580, 586 (2003). In this calculus, "notification of the right to refuse the magistrate judge is a prerequisite to any inference of consent." Id. at 587 n.5.[10]

Bellingham thus reasoned that "[l]ike the provision of the Federal Magistrate Act at issue in Roell, the text of § 157(c) only requires consent simpliciter." 702 F.3d at 569.[11]

**C.    Implied Consent, Waiver, and Forfeiture**

As in Bellingham, Hasse actively participated in the fraudulent transfer proceeding. Her affirmative actions – answering the complaint, participating in discovery, contesting issues at trial – resemble the similar activities of EBIA – the non-creditor defendant – in Bellingham. But much of Bellingham focuses on the "sandbagging" aspects of EBIA's actions and how those actions stood proxy for consent. Id. at 568; see Stern, 131 S. Ct. at 2608 ("[T]he consequences of a litigant . . .

[10]The Court expressed concern over "the risk of a full and complicated trial wasted at the option of an undeserving and possibly opportunistic litigant" — sandbagging, in other words. Id. at 590.

[11]The text of the bankruptcy consent statute is nearly identical to the relevant section of the Magistrate Act; the Magistrate Act confers authority "[u]pon the consent of the parties," 28 U.S.C. § 636(c)(1), whereas a bankruptcy judge may enter final orders in non-core matters "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2).

13

sandbagging the court — remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor — can be particularly severe.") (internal quotation marks and citation omitted).

This focus requires careful consideration as to whether "sandbagging" is necessary for implied consent, or whether it is merely sufficient. Upon examination of Bellingham and Stern, and their treatment of "sandbagging," we hold that while a showing of "sandbagging" may be sufficient for consent, it is not necessary. There are other ways in which the parties may convey their consent, including those present here.

In Bellingham, EBIA's consent was found by and through its actions in the bankruptcy court. Bellingham, 702 F.3d at 570. EBIA's initial action was to move for a jury trial, which the district court treated as a motion to withdraw the reference. Id. at 568. Instead of pursuing a hearing on the withdrawal motion in an Article III court, EBIA petitioned the district court to stay consideration of the motion until the bankruptcy court decided the plaintiff's motion for summary judgment. Id. When the bankruptcy court granted summary judgment to the plaintiff, EBIA abandoned its motion to withdraw the reference and separately appealed to the district court. Id. At the district court, EBIA again failed to object to the bankruptcy court's authority. Id. EBIA even failed to raise the issue in its briefing to the Ninth Circuit, only raising it in a motion to dismiss shortly before oral argument. Id.

In sum, EBIA had been alerted to the bankruptcy court's possible lack of authority, had ample opportunity to object,

affirmatively participated in litigation at the bankruptcy court and district court, and only objected once it had lost in both those courts.

> Because EBIA waited so long to object, and in light of its litigation tactics, we have little difficulty concluding that EBIA impliedly consented . . . . "No procedural principle is more familiar to this Court than that a constitutional right, or a right of any other sort, may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."

Id. (quoting U.S. v. Olano, 507 U.S. 725, 731 (1993)) (internal quotation marks and citation omitted).

Thus, under Bellingham, sandbagging can supply consent through the knowing failure to object while purposefully proceeding through the bankruptcy court system.

**D.    Hasse's Participation with Notice as Consent**

But, as indicated before, Hasse's case is different than Bellingham. There, the non-creditor defendant "sandbagged" the court and its opponent in a way that belied its knowledge of potential Stern problems. The Ninth Circuit thus found consent from the non-creditor's conscious and knowing manipulation of the process to its own perceived advantage. This type of volitional calculation squares with the level of consent necessary to confer upon a non-Article III court the power to enter a final judgment, as found in the magistrate cases relied upon by Bellingham.

Here, however, Hasse was not calculating; she and her counsel were clueless. It was only after this Panel raised the issue that she even formulated an objection to the authority of the bankruptcy judge to "determine" the matter and enter a final order. These facts thus present a variation on the consent

15

theme: the record here is devoid of facts that indicate any "sandbagging" or manipulation of the litigation process. The record, however, is replete with instances of Hasse's conscious engagement and use of the bankruptcy court and the services of this Panel to resolve the Trustee's claim in her favor. More importantly, these actions were undertaken against an almost unavoidable backdrop which called the bankruptcy court's authority into question. As stated previously, despite the background rumblings of Marshall v. Stern (In re Marshall), 600 F.3d 1037 (9th Cir. 2010) at the Ninth Circuit and Stern v. Marshall at the Supreme Court, Hasse stood mute while the bankruptcy court and this Panel endeavored to resolve the dispute. Under Bellingham, is that level of knowing inaction sufficient?

To answer that question is to examine in detail what level of consent is required. Bellingham tells us that implied consent works, but does not address whether that implied consent must be accompanied by at least something akin to unexpressed acquiescence – some acknowledgment of the issue coupled with inaction – or whether simply participating in the court proceeding without raising the issue is sufficient.

The issue of the proper basis for consent to a bankruptcy court's authority to enter a final judgment has a long history. The Supreme Court has long held that simple participation by a creditor in the claims resolution process constitutes consent to the entry of a final order as to that claim. Bryan v. Bernheimer, 181 U.S. 188, 197 (1901) (consent to summary jurisdiction by filing proof of claim); Katchen v. Landy, 382

16

U.S. 323, 334 (1966) (filing proof of claim confers summary jurisdiction on bankruptcy court over preference actions and actions to recover property filed by the bankruptcy trustee in claim disallowance action); Cline v. Kaplan, 323 U.S. 97, 99 (1944) (dicta).  Cf. Alexander v. Hillman, 296 U.S. 222, 238-39, 242-43 (1935) (claim filed in federal equity receivership submits claimant to court's jurisdiction in respect of all defenses, objections, and counterclaims).

It has also held that filing a proof of claim is a waiver of the right to have a jury determine the existence and amount of the claims against the estate, Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990) (per curiam), and is also a waiver of any state sovereign immunity otherwise protected by the Eleventh Amendment. Gardner v. New Jersey, 329 U.S. 565, 573-74 (1947).

The main difference here, however, is that Hasse is not a creditor of the estate.  Thus, the constitutional ability of Congress to allocate final adjudicatory power over a claim for relief to a non-Article III court is more limited.[12]  As a

---

[12]One of the most enduring definitions of Congress's power under the Bankruptcy Clause is that the power:

> extends to all cases where the law causes to be distributed, the property of the debtor among his creditors: this is its least limit.  Its greatest, is a discharge of the debtor from his contracts.  And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject-distribution and discharge-are in the competency and discretion of congress.

In re Klein, 42 U.S. (1 How.) 277, 281 (1843) (emphasis supplied) (Catron, J., sitting as circuit justice; case reported in a note to Nelson v. Carland, 42 U.S. (1 How.) 265 (1843), inserted therein "as being of general interest").  Klein was indicated as
(continued...)

17

consequence, those cases finding the power to decide exists because of mere participation, regardless of consent, are not particularly persuasive.

The issue thus turns to whether Bellingham's concept of consent requires waiver – the intentional relinquishment of a known right – or whether the required consent can be supplied through forfeiture. Although the two doctrines are similar, the distinction between them is well-known: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." Olano, 507 U.S. at 733 (internal quotation marks and citation omitted). That forfeiture might be sufficient is foreshadowed by Bellingham itself, which quotes Olano when describing the actions relevant there. Bellingham, 702 F.3d at 568.

But we need not wade into this issue. There is more happening here than simple forfeiture. Throughout, Hasse was represented by counsel, who actively represented her interests and who made all of the discretionary decisions such representation entails. These types of discretionary decisions include the decision to challenge the authority of the court hearing the matter. Hasse's counsel knew or should have known of Stern. The Ninth Circuit's opinion in Marshall v. Stern was issued one week before Hasse answered the adversary complaint and

---

[12](...continued)
the source of one of the "oft-quoted" definitions of the bankruptcy power in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 588 n.18 (1935).

18

nine months before trial. The Supreme Court granted certiorari in Stern v. Marshall two months before trial. Under Bellingham, this is notice of the issue. Bellingham, 702 F.3d at 569 (citing Marshall v. Stern, 600 F.3d at 1037).

The moment when such a decision is presented matters, because, to the extent the magistrate analogy relied upon by Bellingham holds, courts both before and after Roell have held that a represented party who participates without objection in proceedings before a magistrate judge has impliedly consented to that judge's authority to enter a final order or judgment.[13] Stevo v. Frasor, 662 F.3d 880, 883-84 (7th Cir. 2011) (express consent to first magistrate judge deemed implied consent to authority of second magistrate judge where plaintiff had proceeded through discovery and summary judgment without objection); Heft v. Moore, 351 F.3d 278, 281 (7th Cir. 2003) (implied consent found in participation in proceeding without objection); Baker v. Socialist People's Libyan Arab Jamahirya, 810 F. Supp. 2d 90, 98-99 (D.D.C. 2011) (implied consent found where properly-served defendants, including the Syrian Arab Republic, chose to "sit back and wait" and only moved to vacate a default judgment after eight years of litigation because the judgment was "not to their liking"); Warren v. Thompson, 224

_____

[13]We do not reach the issue of whether unrepresented parties are inherently deemed unaware of the right to refuse consent and demand an Article III forum. The Ninth Circuit, however, has found that a pro se plaintiff who had expressly consented to the authority of one magistrate judge thereby impliedly consented to the authority of a different magistrate judge upon case reassignment. Wilhelm v. Rotman, 680 F.3d 1113, 1119 (9th Cir. 2012).

19

F.R.D. 236, 238-39 (D.D.C. 2004) (plaintiff's counsel participated in pre-trial and trial proceedings).[14] Cf. U.S. v. Gamba, 541 F.3d 895, 900 (9th Cir. 2008) (consent of client to magistrate judge's presiding over closing argument to jury could be vested in counsel alone, and not require client's participation or express consent); 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE & PROCEDURE § 3071.2 & n.19.3 (2d ed. 1997 & Supp. 2013); 14 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 73.03[6] (3d ed. 2012).

Under this authority, passive and unwitting participation is not sufficient for a finding of voluntary consent. The Ninth Circuit, for example, has rejected implied consent where a pro se plaintiff's initial act was to demand a hearing in the district court; the plaintiff proceeded with the magistrate judge only because she thought it was her only choice to obtain relief. Anderson v. Woodcreek Venture Ltd., 351 F.3d 911, 919 (9th Cir. 2003). Similarly, the Seventh Circuit held that neither the plaintiff nor defendant had consented to bankruptcy court jurisdiction simply because they had filed motions for abstention and withdrawal of the reference, respectively. Ortiz v. Aurora Health Care, Inc. (In re Ortiz), 665 F.3d 906, 915 (7th Cir. 2011). The Fifth Circuit held that a pro se state prisoner plaintiff in a 42 U.S.C. § 1983 action did not impliedly consent

[14]One bankruptcy court has reasoned that Roell and Bellingham lead to the conclusion that a defendant in a preference action impliedly consents to the entry of default judgment by failing to respond to a summons that states that such failure might result in a default judgment. Exec. Sounding Bd. Assocs. Inc. v. Advanced Mach. & Eng'g Co. (In re Oldco M Corp.), 484 B.R. 598 (Bankr. S.D.N.Y. 2012).

where it was not shown that he "was notified of his right to withhold consent and retain his right to object to the magistrate judge's findings before the district court."  Donaldson v. Ducote, 373 F.3d 622, 624–25 (5th Cir. 2004).

These cases distill into a relatively simple principle: once a party is alerted, or is held to be alerted, to the potential risks of failing to raise the issue of the tribunal's authority, there is a rebuttable presumption that such failure to act was intentional, and that further purposeful proceeding in the forum indicates consent.  If applicable, this presumption then shifts the burden to the objecting party to show a lack of consent, a burden that requires more than a simple statement after litigation has been completed that consent had never been fully given.[15]

In this case, there was early notice of the possible infirmity.  Bellingham established that the Ninth Circuit opinion in Marshall v. Stern, combined with the Supreme Court decision in Granfinanciera, alerted the legal world to bankruptcy courts' possible lack of authority to decide fraudulent transfer actions.  Bellingham, 702 F.3d at 569.  In this case, the Ninth Circuit issued its opinion in Marshall v. Stern one week before Hasse answered the Trustee's complaint.

The continued participation in light of the infirmity in

_____

[15]The same reasoning applies to the grant of default judgments.  The silence of a defendant who has been properly served is a waiver of the right to contest the factual allegations in the complaint.  See Rule 7055; 10A FEDERAL PRACTICE AND PROCEDURE, supra, at § 2682 (3d ed. 2012); cf. Televideo Sys. Inc. v. Heidenthal, 826 F.2d 915, 917–18 (9th Cir. 1987).

21

authority is also present. Bellingham held that the non-creditor's failure to object to the bankruptcy court's authority until the appeal reached the Ninth Circuit — such objection relying on Stern and made more than one year after the Ninth Circuit issued Marshall v. Stern — amounted to a waiver of its right to have an Article III court determine the matter. Id. at 569-70. Bellingham is thus consistent with those magistrate cases that find participation by represented parties involves the type of knowing engagement or purposeful availment that equates with the required consent.

Against this background, Hasse's conduct undoubtedly aligns with those cases that find implied consent. She was and is represented by counsel, and we thus can assume that she was aware of her right to refuse consent and demand an Article III forum. The Ninth Circuit's publication of Marshall v. Stern made, or should have made, her counsel aware of the bankruptcy court's possible lack of constitutional authority. Despite this knowledge, Hasse extensively participated in litigation at the bankruptcy court and on appeal without raising any challenge to the bankruptcy court's constitutional authority.[16] To allow her to now challenge the court's authority to enter a final order on the basis of lack of consent would be to ignore Bellingham's equating such participation with the voluntary acceptance of the bankruptcy court's ability to determine the matter and enter a

[16]In the permitted supplemental briefing, Hasse offered no coherent or consistent explanation as to why her conduct did not constitute consent; indeed, Hasse never raised or discussed the issue before this Panel raised it on its own.

22

final judgment. We thus hold that Hasse's conduct constituted consent to the authority of the bankruptcy court to hear and determine – and enter a final judgment – in this case. As a consequence of this holding, and despite Bellingham's citation of Olano, we do not reach the issue of whether simple forfeiture – a failure to act without examination of the intent or motivation, if any, of that failure – can suffice for the type of consent Bellingham requires.[17]

### III.  FRAUDULENT TRANSFER ANALYSIS

**A.  The Bankruptcy Court's Finding That Pringle Did Not Receive Reasonably Equivalent Value Was Not Clearly Erroneous**

The substantive issue on appeal is whether Pringle's gift deed of the Residence to Hasse is avoidable under § 548. Section 548 allows a trustee in bankruptcy to set aside or avoid certain "transfer[s] . . . of an interest of the debtor in property." § 548(a)(1). Section 101(54)(D) defines a transfer as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–[¶] (i) property; or [¶] (ii) an interest in property." In short, "a transfer is a disposition of an interest in property. The definition is as broad as possible." Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1282 (9th Cir. 1996).

Here, under applicable Idaho law, the gift deed Pringle

[17]In supplemental briefing, Hasse specifically requested that a state court determine the matter. To the extent this is an objection to this Panel's authority, we simply point out that Hasse affirmatively sought appellate review before this Panel when she could have opted out and appealed directly to the district court. 28 U.S.C. § 158(c)(1). That election surely constitutes consent as contemplated by Bellingham.

23

signed and delivered conveyed all of his interest in the Residence to Hasse. See Hawe v. Hawe, 89 Idaho 367, 406 P.2d 106 (1965). As such it was a "transfer" of his interest in the property.

Once the requisite transfer exists, a trustee must show the following to avoid that transfer under § 548(a)(1)(B):

> a bankruptcy trustee must prove that: (1) the transfer involved property of the debtor; (2) the transfer was made within [two years] of the bankruptcy filing; (3) the debtor did not receive reasonably equivalent value for the property transferred; and (4) the debtor was insolvent, made insolvent by the transaction, operating or about to operate without sufficient capital or unable to pay debts as they become due.

Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply, Inc.), 228 B.R. 727, 729 (9th Cir. BAP 1998) (citing Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 594 (9th Cir. 1991)).[18]

On appeal, Hasse only challenges one of these elements as found by the bankruptcy court: that Pringle did not receive reasonably equivalent value in exchange for his transfer of the Residence.

Even though the Bankruptcy Code does not define what "reasonably equivalent value" means, it "is not an esoteric concept: a party receives reasonably equivalent value . . . if it gets roughly the value it gave." VFB LLC v. Campbell Soup Co.,

---

[18]Spear was decided when the relevant time frame was one year. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23., extended the coverage of § 548 to transfers occurring within two years of the bankruptcy filing for all bankruptcy cases filed on or after April 21, 2006. See 5 COLLIER ON BANKRUPTCY, supra, at ¶ 548.12[13].

24

482 F.3d 624, 631 (3rd Cir. 2007). "Reasonably equivalent value" is a key concept in fraudulent transfer law. As the underlying goal of § 548 is to preserve estate assets, courts assess reasonably equivalent value from the creditors' perspective. See In re United Energy Corp., 944 F.2d at 597; Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP), 408 B.R. 318, 341-43 (Bankr. N.D. Cal. 2009).

This examination requires the court to consider all of the circumstances surrounding the transfer, id., but "the focus is whether the net effect of the transaction has depleted the bankruptcy estate." Harman v. First Am. Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 485 (4th Cir. 1992).

An examination into reasonably equivalent value is comprised of three inquiries: (1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received. In re Brobeck, Phleger & Harrison LLP, 408 B.R. at 341-43; Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.), 309 B.R. 314, 319 (8th Cir. BAP 2004); 5 COLLIER ON BANKRUPTCY, supra, ¶ 548.05[2][a].

"Value" is defined in the statute as: "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor . . . ." 11 U.S.C. § 548(d)(2). "Case law has embroidered this concept to include 'any benefit' to the debtor, 'direct or indirect' as value. Indeed, with only limited exceptions, "any . . . kind of

25

enforceable executory promise is value for purposes of section 548." 5 COLLIER ON BANKRUPTCY, supra, ¶ 548.03[5]. Regardless of its form, the economic benefit must be real and quantifiable. Gold v. Marquette University (In re Leonard), 454 B.R. 444, 458-59 (Bankr. E.D. Mich. 2011); Zubrod v. Kelsey (In re Kelsey), 270 B.R. 776, 781 (10th Cir. BAP 2001).

Here, however, at least part of the value Hasse promised was for Pringle's future care. Section 548(d)(2) is explicit in its exclusion of that type of value from the reasonably equivalent value calculus; value "does not include an unperformed promise to furnish support to the debtor." To the extent Hasse's value fell into this category, it cannot factor into the reasonably equivalent value calculation. See, e.g., Simione v. Nationsbank of Del., N.A. (In re Simione), 229 B.R. 329, 335 (Bankr. W.D. Pa. 1999).

But arguably some of the value given by Hasse consisted in the satisfaction of Pringle's obligations to Hasse for support given or provided to Pringle before the transfer. Although an executory promise of future support is not value, the satisfaction of an existing valid debt for past support is. See Schilling v. Montalvo (In re Montalvo), 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005) (spouse's transfer of money to other spouse for customary household and living expenses was for value in that it satisfied spouse's legal support obligation).

For that part of Hasse's value not excluded by section 548(d)(2), the value to the estate must be reasonably equivalent to the value given up – here as represented by the Residence's $35,000 value. This equivalence need not be precise. "By its

26

terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.), 490 F.3d 1325, 1336 (11th Cir. 2007) (citation omitted).

Even against this relatively relaxed standard, Hasse does not point to any particular error in the manner in which the bankruptcy court determined reasonably equivalent value; instead, Hasse contends that the services she promised to perform for Pringle (Pringle's care and allowing him to continue to live in the Residence) were sufficient consideration to support the deed. In support, she cites Baker v. Pattee, 684 P.2d 632, 635-36 (Utah 1984).

But Hasse's reliance on Baker is misplaced. Consideration sufficient to support a simple contract is a different concept than reasonably equivalent value under fraudulent transfer law. Baker demonstrates this. It upheld a trial court's finding that the defendant gave sufficient consideration to defeat an equitable action under Utah law to cancel a deed for failure of consideration. It made no finding of the equivalence of exchange, instead finding that the grantor had given "adequate and substantial consideration" for the property, id. at 636, a standard quite different from "reasonably equivalent value."

Here, we are not dealing with a finding concerning the sufficiency of consideration under state law, but rather with a finding under § 548 that Pringle did not receive reasonably equivalent value. As the cases we cite above reflect, the concept of reasonably equivalent value is markedly different from

27

the concept of sufficiency of consideration. Moreover, Baker is based in large part on the "considerable deference" that the Utah Supreme Court gave to the trial court's finding of sufficient consideration. Id. at 634. The bankruptcy court's finding here, that Pringle did not receive reasonably equivalent value, also is entitled to considerable (if not even greater) deference under the applicable federal standard of review. See Rule 8013; Forest Grove School Dist. v. T.A., 638 F.3d 1234, 1239 (9th Cir. 2011).

The bankruptcy court did not specify what (if any) market value it assigned to Hasse's promises or to her past care, but we know of no authority compelling it to do so under these circumstances. The court simply found: "whatever value, real value came out of [Hasse's] promise, was not reasonably equivalent to the value that the debtor gave up in this exchange and that was a $35,000 unencumbered house." Hr'g Tr. (Jan. 4, 2011) at 7:23-8:2.

We believe that the record was sufficient to support the court's finding. A bankruptcy court's determination of reasonably equivalent value is a finding of fact that we review under the clearly erroneous standard. See Rule 8013; Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109-10 (9th Cir. 2010). The clearly erroneous standard of review is difficult for any appellant to overcome. Under the clearly erroneous standard we may not reverse based on the bankruptcy court's factual findings unless they are: "'[1] illogical, [2] implausible, or [3] without support in inferences that may be drawn from the facts in the record.'" Forest Grove School Dist, 638 F.3d at 1239 (quoting United States v. Hinkson, 585 F.3d 1247, 1263 (9th

28

Cir. 2009) (en banc)).

Hasse's evidence on the nature, timing and extent of her promises was equivocal at best.[19]  Furthermore, even if we were to assume that Hasse's promises and past care had substantial market value, a number of different concerns could have legitimately caused the bankruptcy court to discount that value. Those concerns include but are not limited to: the risk of future nonperformance, the nebulous/unquantifiable value of some aspects of what services were promised or rendered, the likelihood that Hasse was willing to, and did, take care of Pringle even without the transfer (based on their longstanding relationship), and § 548's express exception to the definition of value of "unperformed promise[s] to furnish support."

In short, on this record, we simply cannot conclude that the bankruptcy court's reasonably equivalent value finding was "[1] illogical, [2] implausible, or [3] without support in inferences that may be drawn from the facts in the record."  See Forest Grove School Dist., 638 F.3d at 1239 (internal quotation

---

[19]Indeed, on appeal, Hasse suggested that the value given in exchange included her prior care for Pringle (as much as her promise to care for him in the future).  And yet there was no evidence in the record indicating that Hasse ever intended to charge Pringle for the prior care he received, or that the transfer of the Residence was quid pro quo for such prior care. See In re Brobeck, Phleger & Harrison LLP, 408 B.R. at 341 ("A transfer is for value [for purposes of § 548] if one is the quid pro quo of the other."); Slone v. Lassiter (In re Grove-Merritt), 406 B.R. 778, 806 (Bankr. S.D. Ohio 2009) (citing cases and holding that the value must be given quid pro quo for the assets the debtor transferred).  Hasse's references to both prior care and promises of future care further muddy the waters regarding what was agreed to and the value of what was received in exchange for the Residence.

29

marks and citation omitted). As a result, the bankruptcy court did not commit reversible error when it found that Pringle did not receive reasonably equivalent value in exchange for the transfer of the Residence.

**B.    The Bankruptcy Court Did Not Err When it Rejected as a Matter of Law Hasse's "No Harm, No Foul" Argument**

Hasse argues that the transfer of the Residence does not constitute a fraudulent transfer because, if Pringle had not transferred it, he would have been able to claim an exemption in the Residence in any event, so his creditors are no worse off as a result of the transfer than they would have been absent the transfer. This is the so-called "no harm, no foul" argument.[20]

The Ninth Circuit rejected this argument in In re Noblit, 72 F.3d at 758-59. In that case, before filing for bankruptcy, the debtor had transferred a portion of the proceeds from the sale of her house to Arlan and Donna Smoker to satisfy a preexisting debt. When the trustee sued the Smokers to avoid and recover the transfer as a preference under § 547, the Smokers argued that, if the debtor simply had kept the house, she would have been entitled to claim a homestead exemption, so the debtor's creditors were no worse off as result of the transfer. Id. at 758. In rejecting this argument, Noblit reasoned that the exemption was "personal to the debtor" and that when the debtor made the transfer, she essentially waived any exemption that she

---

[20]As this is an interpretation of section 548 and the Code generally, this argument raises a question of law which we review de novo. See Tavenner v. Smoot, 257 F.3d 401, 405-07 (4th Cir. 2001); In re Trujillo, 215 B.R. at 203.

30

otherwise might have claimed.  Id.  After all, the debtor thereby gained the use of the proceeds of the transfer.  Noblit further reasoned that the Smokers, as the transferees who had received the preference, had no standing to raise any such exemption as a defense against the trustee's preference avoidance action.  Id.

In In re Trujillo, 215 B.R. at 205, we followed Noblit in rejecting a similar argument under § 548.  We also rejected an alternate argument based on the same "no harm, no foul" theory that, even if the subject transfer was a fraudulent transfer under § 548, the transfer should not be avoided because the transfer did not diminish the debtor's bankruptcy estate.  Id. at 204.  We acknowledged that this no-diminishment-of-the-estate argument had validity prior to the 1978 enactment of the Bankruptcy Code because, under the Bankruptcy Act of 1898, exempt property did not qualify as property of the estate.  See id. at 205.  In contrast, we pointed out that the Bankruptcy Code treats the debtor's property subject to exemptions as property of the estate.  Id.  In other words, unless and until the debtor actually claims an exemption in the subject property and that exemption is allowed, the subject property remains property of the estate.  Id.  We further noted that the no-diminishment-of-the-estate argument cannot be reconciled with § 522(g), which in relevant part effectively prohibits a debtor from claiming an exemption in property recovered by the trustee to the extent the debtor voluntarily transferred away that property.  215 B.R. at 205.

A handful of cases since the enactment of the Bankruptcy Code have accepted the no harm, no foul argument.  See, e.g.,

31

Kapila v. Fornabaio (In re Fornabaio), 187 B.R. 780, 782-83 (Bankr. S.D. Fla. 1995); Jarboe v. Treiber (In re Treiber), 92 B.R. 930, 932 (Bankr. N.D. Okla. 1988). But the majority of courts addressing the issue have rejected the argument for essentially the same reasons that Noblit and Trujillo rejected it. See, e.g., Tavenner, 257 F.3d at 406-07; Sullivan v. Welsh (In re Lumbar), 457 B.R. 748, 754 (8th Cir. BAP 2011). Regardless of contrary authority outside the circuit, binding authority within the circuit has not changed. Following Noblit and Trujillo, as we must, we conclude that the bankruptcy court did not err when it rejected Hasse's no harm, no foul argument.

**C. The Bankruptcy Court Did Not Commit Reversible Error When it Found That Pringle Made the Transfer with the Intent to Hinder or Delay Luna and That Pringle Was Indebted to Luna for Purposes of § 548**

Hasse also challenges the bankruptcy court's alternate determination that the transfer of the residence constituted an intentional fraudulent transfer under § 548(a)(1)(A).[21] Here

---

[21]Unlike the Uniform Fraudulent Transfer Act, "reasonably equivalent value" is not a defense to avoidance with respect to a transfer made with the actual intent to hinder, delay, or defraud. Compare Unif. Fraudulent Transfer Act § 8(a) ("A transfer or obligation is not voidable under [the provision related to transfers made with the intent to defraud] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.") with 11 U.S.C. § 548(c) ("[A] transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.").

32

again, given the inherent factual nature of these questions, we review the bankruptcy court's findings that Pringle intended to hinder or delay Luna and that Pringle was indebted to Luna at that time for error under the clearly erroneous standard. See Rule 8013; Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 805 (9th Cir. 1994).

Because direct evidence of intent is rare, courts tend to infer the existence of an intentional fraudulent transfer from the circumstances surrounding the transfer. In re Acequia, Inc., 34 F.3d at 805-06.

> Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.

> The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.

Id. at 806 (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)). See also Unif. Fraudulent Transfer Act § 4(b)(1)-(11) (listing badges of fraud); 5 COLLIER ON BANKRUPTCY, supra, ¶ 548.04[1][b][i].

The record contains uncontroverted evidence of virtually all of Acequia's indicia of fraudulent intent. The Residence constituted most if not all of Pringle's net worth. The transfer was to a long-term companion, and Pringle remained in possession. Finally, and as a sockdolager, Pringle admitted that he

33

transferred the Residence in part because of his concern over Luna's lawsuit.

Hasse has not disputed any of these facts. She argues, however, that there was insufficient evidence from which the court could have concluded that Pringle was indebted to Luna. Again, the clearly erroneous standard requires a strong showing of error: we cannot dismiss the bankruptcy court's factual finding of the existence of a claim unless that finding was "[1] illogical, [2] implausible, or [3] without support in inferences that may be drawn from the facts in the record." Forest Grove School Dist., 638 F.3d at 1239 (internal quotation marks and citation omitted).

Hasse has not met this standard. As noted above, Pringle admitted at trial that, at the time of the transfer, Luna was suing him for roughly $100,000 on account of an automobile accident. This was more than sufficient evidence to support the court's finding that Pringle was indebted to Luna within the meaning of § 548. While Congress did not define the word "indebted" either in § 548 or elsewhere in the Bankruptcy Code, "indebted" commonly and unambiguously refers to the condition of being in debt.[22] In turn, the Bankruptcy Code defines "debt" as "liability on a claim," § 101(12), and broadly defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

---

[22]See Oxford English Dictionary, Online edition, http://www.oed.com/view/Entry/94198?redirectedFrom=indebted#eid (last visited July 2, 2013) (stating that "indebted" means "Under obligation on account of money borrowed; owing money; in debt.").

34

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

§ 101(5).

In light of the definitions of "claim" and "debt," the bankruptcy court reasonably inferred that Luna's $100,000 claim against Pringle constituted a debt under § 101(12) – albeit an unliquidated and disputed one. Pringle was thus "indebted" to Luna within the meaning of § 548(a)(1)(A). The bankruptcy court's finding was not clearly erroneous.

In addition, given the admission of intent as to Luna, and the other badges of fraud evident here, the bankruptcy court could have inferred that Pringle had a general intent to defraud his present or future creditors at the time of the transfer. See 5 COLLIER ON BANKRUPTCY, supra, at ¶ 548.04[1] (stating that "general intent to hinder, delay or defraud present or future creditors" is sufficient; "proof of the target's identity is not required.").

Against this background, the bankruptcy court did not commit reversible error when it found that Pringle made the transfer of the Residence with the intent to hinder or delay Luna and that Pringle was indebted to Luna for purposes of § 548(a)(1)(A).

## IV. CONCLUSION

For the reasons set forth above, the judgment of the bankruptcy court is AFFIRMED.

35